580 So.2d 1140 (1990)
Darrell RYALS, Individually and d/b/a Ryals Rentals, Allen Ryals, Individually, and d/b/a Ryals Rentals, Jimmy Barrett, Individually, and d/b/a Bogue Chitto Choo Choo
v.
Charles Ray PIGOTT, Glen W. Crawford, Julius O'Quinn, Jr., Otis Ray House, Sheriff Duane Dillon, et al.
No. 07-CA-59531.
Supreme Court of Mississippi.
November 28, 1990.
Rehearing Denied June 12, 1991.
*1142 Dan R. Wise, J. Douglas Johnson, Hattiesburg, for appellants.
Norman B. Gillis, Jr., Gillis & Gillis, Keith Starrett, McComb, Mike Smith, Magnolia, for appellees.
Charles Ray Pigott, pro se.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This highly localized controversy presents questions of great public importance: whether (and which) freshwater rivers *1143 and streams are held by the state for public use and by what criteria we address the question.
In the case at bar, the Chancery Court held that riparian Landowners in southeastern Pike County held rights in the Bogue Chitto River such that they could of right exclude the public from the surface waters. Finding that the Court erred in its fundamental premises, we reverse and render on this issue. In all other respects the judgment of the Chancery Court is affirmed.

II.

A.
Darrell Ryals and Allen Ryals (Ryals) are adult resident citizens of Pike County, Mississippi, who do business as a partnership under the trade name of Ryals Rentals. Jimmy Barrett (Barrett) is an adult resident citizen of Pike County, Mississippi, who does business as a sole proprietorship under the trade name of Bogue Chitto Choo Choo. Ryals Rentals and Bogue Chitto Choo Choo have their principal offices near the banks of the Bogue Chitto River in southeastern Pike County below U.S. Highway 98 and are in the business of renting to members of the public canoes and tubes for floating the River. Darrell Ryals, Allen Ryals and Jimmy Barrett were the Plaintiffs below and are the Appellants here, and are sometimes collectively labeled Plaintiffs.
Charles Ray Pigott and Otis Ray House are adult resident citizens of Pike County, Mississippi. Glen W. Crawford and Julius O'Quinn, Jr. are adult resident citizens of Walthall County, Mississippi. Pigott, House, Crawford and O'Quinn are riparian Landowners through whose property in southeastern Pike County the Bogue Chitto River flows. Pigott, House, Crawford and O'Quinn were among the Defendants below and are among the Appellees here, and are sometimes collectively labeled Landowners.
Duane Dillon was and is an adult resident citizen of Pike County, Mississippi, and is the duly elected and serving Sheriff of that county. Sheriff Dillon was a Defendant below and is one of the Appellees here.

B.
The Bogue Chitto River in southeastern Pike County has for a number of years been
... popular with the general public for canoeing, tubing, swimming, camping, fishing and other outdoor recreational activities, ...,
and the Chancery Court so found. Over the years conflicts have arisen between riparian Landowners and those using the River, and those conflicts have escalated of late. One source of strife has been that persons using the River deposit debris and litter. Landowners became particularly concerned when one of their number was sued in a personal injury action. Dumas v. Pike County, Mississippi, 642 F. Supp. 131 (S.D.Miss. 1986).
In any event, on June 29, 1987, by reason of real or imagined fears that, just before the commercially lucrative Fourth of July weekend, Landowners and Sheriff Dillon were about to close the River, Ryals and Barrett commenced the present proceedings by filing their complaint in the Chancery Court of Pike County, Mississippi, demanding of and against Landowners and Sheriff Dillon declaratory, injunctive, monetary and other relief.
On July 3, 1987, the Court heard ex parte Plaintiffs' application for temporary relief and, upon finding "that the Bogue Chitto River was a public waterway," temporarily enjoined Defendants from interference with Plaintiffs' enjoyment of the River, subject to Plaintiffs' posting specified security. Plaintiffs failed to post security, and the injunction never issued.
In due course, the matter came on for trial, and, on February 29, 1988, the Court released an opinion finding, inter alia, that the Bogue Chitto River in the area in question was not a public waterway within the meaning and contemplation of Miss.Code *1144 Ann. §§ 1-3-31[1] or 51-1-3[2] (1972), nor within Miss. Code Ann. § 51-1-4 (1972).[3] Even if the River satisfied Section 51-1-4, the Court held that statute, as it then read, a taking of Landowners' property rights in the River. By reason of the private nature of the River, the Court held Landowners' rights in it protected by Miss. Const. Art. 3 §§ 14 and 17 (1890), such that the public could acquire no rights therein without payment of due compensation.
On March 24, 1988, the Chancery Court entered final judgment dismissing Ryals' and Barrett's complaint with prejudice. From this order, the Plaintiffs prosecute the present appeal.

III.
The River Bogue Chitto flows through at least three counties in South Mississippi. It has its source in Lincoln County just south of Brookhaven, where East Bogue River merges with West Bogue River, and flows southeasterly through Pike and Walthall Counties and into the State of Louisiana where it meanders further to the east and  at least 175 miles below its source  conjoins with the Pearl River, which in turn flows into the Gulf of Mexico.[4] The Bogue Chitto is no "small *1145 river."[5] It is certainly not short.
The Bogue Chitto has been with us through the millenia. The Choctaws aptly named it "big creek." The many communities that dot its banks and follow its course stand as eloquent testimony to its centrality in the lives of people, then and now. Within this century it has been enough of a river to have avulsively changed its course at least twice, below the Mississippi-Louisiana state line. See Bickham v. Bankston, 210 So.2d 88, 91 (La. App. 1968).
Charles T. Branch,[6] qualified at trial as an expert on water management, used maps and graphs compiled by the U.S. Geological Survey, and told us that "today" just above the area in dispute the River's average depth is greater than four feet, its average width greater than seventy feet.
Well, the stage during the time of which the U.S.G.S. cross sections was taken was 6.26 feet. That is a stage which would have been this low level right here which still would have been a depth of some 5 feet at the bridge. The seven-eight-ten-year low flow which is a baseline flow we use in water resource regulation would correspond to a stage of 5.95 feet and a discharge of 188 cubic feet per second.[[7]] At that stage you still would have a depth of some five feet or near five feet and at the minimal flow of record of a stage of 5.093 feet which is a record low flow of 175 cubic feet per second which occurred October 31, 1963. You still would have a depth in excess of four feet at that bridge at the deepest part of the channel.
Although the study dealt with an area just north of that in question, Branch reminded us of the obvious: that, as you go further south, the River's drainage area and flow increases from tributaries.[8] The channel size of the River will increase to accommodate that flow, becoming larger the closer it gets to the Gulf of Mexico. We note that the U.S.G.S. conducted its study in summer low-water conditions, and the Bogue Chitto still measured in excess of 120 feet across at some points.
In its ordinary condition the Bogue Chitto River is capable of supporting navigation and transportation by canoes, outboard motor boats and other small vessels. Without doubt it could support travel by the once familiar flatboats. The feasibility of floating logs down the river may be questionable, but it could be done. The River is popular with the public for canoeing, fishing and other outdoor recreational activities,[9] *1146 many of which have a commercial component.
Fallen trees, sunken logs, or silt may clog the River at points, but this means only that the state has not pursued its constitutional and political prerogative of purging the channel of obstructions to navigation. See Miss. Const. Art. 4, § 81 (1890); Dycus v. Sillers, 557 So.2d 486, 501 (Miss. 1990). The suggestion below that the River is not navigable, if it invokes Section 1-3-31's 200 bales-of-cotton-steamboat test, is but irrelevant, as we presently explain. The suggestion is otherwise disingenuous, for the very seeds of this suit have been substantial and continuous (and commercially augmented) navigation of the Bogue Chitto River by weekend pleasure boaters, canoers and tubers.
Because the Bogue Chitto is perceived a public river, public recreational facilities abut its banks. These include (a) Summit Water Park northeast of McComb, providing a boat launching ramp, (b) Bogue Chitto Water Park, twelve miles east of McComb and near to the area here in controversy, providing canoe rentals, mapped float trips, and boat launching, and (c) Walker's Bridge Water Park in Walthall County, providing boat launching. Holmes Water Park lies on the bank of Magee's Creek only a few feet above its entry into the Bogue Chitto in Walthall County.[10]

IV.

A.
The Chancery Court correctly observed ab initio
A navigable stream is in effect public property, while a non-navigable stream belongs to the owner of the lands through which it flows. If the Bogue Chitto is navigable, then it has always been owned by the state in trust for the public. If it is not navigable it belongs to the landowners of the property through which it ran, prior to 1972.
Whether our River be navigable, and what may be meant by "navigable," are but means to our guess whether the River be public.
Otis Ray House, one of Landowners' number, was close to the mark in this colloquoy with counsel opposite:
Q If somebody floats that river all the way and their foot does not touch the bank on the side or the bottom, is it your position they're trespassing?
A If their foot don't ever touch the bottom, they are not trespassing.
Q That's your view?
A Yes.
Q And that's your understanding of the situation.
A Yes. Yes.
Q All right.
A The state owns the water in my opinion. That's the way I have looked at the thing.

B.
Our federal forebears founded today's law. Under the familiar Equal Footings *1147 Doctrine, the sovereign United States conveyed the waters in trust for the people, acceptance by the states being a condition of statehood, and through its law the federal sovereign has identified the waters so conveyed according to the common need. Cinque Bambini Partnership v. State, 491 So.2d 508, 511-12 (Miss. 1986), aff'd sub nom. Phillips Petroleum Company v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); reh. den. 486 U.S. 1018, 108 S.Ct. 1760, 100 L.Ed.2d 221 (1988). Fishing to put food on one's table, directly or through the medium of exchange, for sport or for recreation, has long been prominent among those needs and hence among the federal government's public purposes in withholding waters from private ownership. Phillips Petroleum, 484 U.S. at 476, 482, 484, 108 S.Ct. at 795, 798, 799, 98 L.Ed.2d at 885, 889, 890; Shively v. Bowlby, 152 U.S. 1, 57, 14 S.Ct. 548, 569, 38 L.Ed. 331 (1894); Hardin v. Jordan, 140 U.S. 371, 381, 11 S.Ct. 808, 811, 35 L.Ed. 428 (1891); Smith v. Maryland, 59 U.S. (18 How.) 71, 78, 15 L.Ed. 269 (1855); Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 412-14, 10 L.Ed. 997, 1013 (1842). Before and after statehood travel was not easy. Rivers were a major means of mobility, often the only means, "the only way to the outside world,"[11] and few resorted to 200 bale capacity steamboats, not just because they were not then dreamt of but because they were not necessary. We doubt there was a soul who saw the Bogue Chitto susceptible of private ownership for the first century of our existence.[12]
Quite duplicatively, the Act of Congress authorizing formation of this state provided:
That the River Mississippi, and the navigable rivers and waters leading into the same, or into the Gulf of Mexico, ..., shall be common highways, and forever free, ... .
3 Stat. 348, 349 (1817). The Bogue Chitto River was and is a "navigable river and water" leading into the Gulf of Mexico.
The finding that the Bogue Chitto is public waters firmly founded in federal law, we turn to the law of this state.

C.
The United States has historically accorded the several states great latitude in implementing and administering the public trust, and in pursuance thereof, in delineating the waters and tidelands each has held in trust, see Phillips Petroleum, 484 U.S. at 475, 108 S.Ct. at 794, 98 L.Ed.2d at 885, though the question is ultimately one of federal law. This state has not been timid in exercising this privilege.
First, our legislature has been active.[13] At the time of trial at least three state legislative enactments were independently adequate that the Bogue Chitto River in southeastern Pike County be public, only one of which is here challenged under the constitution.[14]
*1148 (1) Miss. Laws, ch. 361, § 1 (1972) vested in the public "the right of free transportation ... to fish and engage in water sports" on
such portions of all natural flowing streams in this state having the length of not less than five miles and which has an average depth along the thread of the channel of three feet for ninety consecutive days in the year and which have an average width at low water of not less than thirty feet... .[15]
This enactment was codified as Miss. Code Ann. § 51-1-4 (Supp. 1973-1987).[16]
(2) Miss. Laws, ch. 82, § 12 (1892) provided
All bays, inlets, and rivers, ..., shall be public highways.[17]
*1149 This statute was codified as Miss. Code Ann. § 51-1-3 (1972).[18]
(3) Miss. Laws, ch. 197, § 2 (1958) declares
that the waterways ... of the state are among its basic resources ... and that the preservation, conservation, storage and control of the waters of the Pearl River and its tributaries and its overflow waters for domestic, municipal, commercial, industrial, agricultural, and manufacturing purposes, for recreational uses, for flood control, timber development, irrigation, and pollution abatement are, as a matter of public policy, for the general welfare of the entire people of the state.
This enactment has been codified as Miss. Code Ann. § 51-9-103 (1972). The Bogue Chitto River is the principal and largest tributary of the Pearl River; hence, this enactment declares those waters public for recreational uses, among others, "for the general welfare of the entire people of the state."
The government of this state administers the federally settled and funded public waters trust. The legislative department of that government has thus declared through its statutes, both as they existed at the time of trial and as they exist today, the Bogue Chitto River is a part of the public waters of the State of Mississippi, open to all of her citizens, and, as well, to citizens of other states.
Of course, small waters and man-made lakes and ponds are susceptible of private ownership and where they are privately owned they cannot be taken without just compensation. U.S. Const. Amends. 5 & 14; Miss. Const. Art. 3, § 17 (1890); Dycus v. Sillers, 557 So.2d 486, 502-03 (Miss. 1990). Of this there can be no doubt,[19] but the converse premise is equally plain. Waters which are public by virtue of the Constitution and the Equal Footings Doctrine, Phillips Petroleum Co. v. Mississippi, 484 U.S. at 473-74, 108 S.Ct. at 793-94, 98 L.Ed.2d at 884, may not  by legislative enactment or judicial decree  be withdrawn from public use. Our legislature has attempted no such withdrawal, and we *1150 should be wary of suggestions for judicial proaction.

D.
The Chancery Court found that the Bogue Chitto was not navigable in fact, and it is important to understand how the Court missed the boat. The question is whether the Bogue Chitto in southeastern Pike County is public waters. Historically such questions have been answered by the shorthand reference to whether the waters be navigable or, as it is sometimes put, "navigable in fact." But "navigable in fact" is and always has been a function of the source and (potential) natural capacities of the waters and the public need therefor, and these have been no more static than life itself.
Construing the act of statehood, Morgan v. Reading, 11 Miss. (3 S. & M.) 366 (1844), perceptively recognized that
Congress has given no new capacities or incidents to these rivers, but has merely declared that the facilities afforded by the natural capacities of the rivers to the public, shall remain without interruption.
11 Miss. at 406. Navigation like politics is the art of the possible and much other than 200-bales-of-cotton commercial steamboat navigation is and always has been within "the natural capacities" of our River.
Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d 627, 633 (Miss. 1967) recognized that the capacities of the waters to serve the public have played a major role in defining the waters which are public. We have recently reaffirmed the view.
Suffice it to say that the purposes of the trust have evolved with the needs and sensitivities of the people  and the capacity of trust properties through proper stewardship to serve those needs.
Cinque Bambini, 491 So.2d at 512.
The "navigable in fact" test has been read and enforced as including much more than traditional commercial navigation in the sense of carriage of goods for hire by water. We recognize the point in Dycus.
Over the years the legislature has provided an evolving definition of navigability, though the legal touchstone has been and remains navigability in fact. Culley v. Pearl River Industrial Commission, 234 Miss. 788, 812, 108 So.2d 390, 398 (1959). And when that definition is fleshed out to mean "capable of being navigated by substantial commercial traffic," Downes [v. Crosby Chemicals, Inc.] 234 So.2d [916] at 919 [(Miss. 1970)] surely no one will suggest exclusion of the navigation of commercial fishermen because their craft are customarily (though not always) smaller than the vessels of common and private carriers of cargo and passengers. See Smith & Hambrick v. Fonda, 64 Miss. 551, 554, 1 So. 757, 758 (1887), considering whether Red Creek was a "navigable or floatable stream" for purposes of "transportation of logs." See also State v. McIlroy, 268 Ark. 227, 234-38, 595 S.W.2d 659, 663-65 (1980); State ex Rel. [Brown] v. Newport Concrete Co., 44 Ohio App.2d 121, 127, 336 N.E.2d 453, 457 (1975).
Dycus, 557 So.2d at 498-99.
"Navigable in fact" has never meant exclusively "navigable in fact by large commercial vessels." A more perceptive statement appears in Rouse v. Saucier's Heirs, 166 Miss. 704, 146 So. 291 (1933):
This title of the state being held for public purposes, chief among which purposes is that of commerce and navigation, ... .
166 Miss. at 713, 146 So. at 292 [Emphasis supplied]. Rouse makes it clear that commerce and navigation are not the only purposes of the trust, for in the next paragraph "fisheries" are included.
The most common of what the Morgan Court in 1844 called "the facilities afforded by the natural capacities of the rivers to the public" is fishing. Since Morgan this state has followed the federal lead and has regularly identified fishing as among the uses to which public waters have been and shall forever remain dedicated. Dycus v. Sillers, 557 So.2d at 498; Cinque Bambini, 491 So.2d at 512, 515; Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d at 632; State ex rel. Rice *1151 v. Stewart, 184 Miss. 202, 231, 184 So. 44, 50 (1938); Rouse v. Saucier's Heirs, 166 Miss. at 713, 146 So. at 292; see also Miss. Laws ch. 361 § 1 (1972).
In the case of public waters, of course, the state has authority to regulate fishing. That authority has never been thought limited only to those rivers of commercially navigable capacity but extends to "all running streams, large lakes [and] small lakes with outlets into other waters." Ex Parte Fritz, 86 Miss. 210, 217, 38 So. 722, 723 (1905).
We find it easy that the public may fish the waters of the Bogue Chitto, and whether fish are biting or are even there in abundance is legally irrelevant. Likewise, the governments of this state and of the United States may regulate use of the waters of the Bogue Chitto, United States v. Appalachian Power Co., 311 U.S. 377, 404-10, 61 S.Ct. 291, 297-300, 85 L.Ed. 243, 250-54 (1940); Shively v. Bowlby 152 U.S. at 33-34, 14 S.Ct. at 560, 38 L.Ed. at 344; Withers v. Buckley, 61 U.S. (20 How.) 84, 92-93, 15 L.Ed. 816, 820 (1857) affirming Commissioners of Homochitto River v. Withers, 29 Miss. 21, 37-40 (1855); Culley v. Pearl River Industrial Commission, 234 Miss. 788, 811-12, 108 So.2d 390, 398 (1959), and we inquire not into the current desirability or necessity of doing so. If the River is public for these purposes, it is public for all, for we know of no waters "a little bit public."
Transportation was an important public purpose our waters served in days gone by. For decades they were our "only way to the outside world."[20]
At the time the constitution was adopted commerce by navigable waters, such as rivers, lakes, bayous and canals was much more common than now ... There were many bayous, lakes and small rivers in the great delta section that were of great use in carrying on local commerce.[21]
Ethridge, Mississippi Constitutions 196 (1928). Another of the more out of date capacities which in law give waters their public character is logging. Smith & Hambrick v. Fonda, 64 Miss. 551, 554, 1 So. 757, 758 (1887). Indeed, "safe passage of ... logs" is protected in our Constitution. Miss. Const. Art. 4, § 81 (1890). Beyond fishing, transportation and logging, this Court has recognized in today's legal context
The overall public interest and purpose in accommodating and expanding population, commerce, tourism and recreation.
Treuting v. Bridge and Park Commission of City of Biloxi, 199 So.2d at 633; see also Cinque Bambini, 491 So.2d at 512.
*1152 Our attention is called to Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971), wherein the Court recited the familiar explication:
Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and/or travel are or may be conducted in the customary modes of trade and travel on water....[22]
403 U.S. at 10, 91 S.Ct. at 1776, 29 L.Ed.2d at 279.
The ordinary condition of waters evolves with time, albeit often imperceptibly. The customary modes of commerce and trade and travel on waters change as well. The record before us reflects that the customary mode of travel on the Bogue Chitto River in southeastern Pike County is through small outboard motor boats, fishing boats, canoes, tubes and other pleasure craft. The customary mode of commerce and trade is providing facilities for hire where persons can rent such vessels. Moreover, the Bogue Chitto is surely capable in its ordinary condition today of supporting commercial fishing. Taking the navigable-in-fact definition at face value and accepting the dynamic quality inescapably embedded in its language, the Bogue Chitto River passes the test; it is public!
Our founding and still central point is that at statehood the United States vested in all of the people in Mississippi access to those waters which by their natural capabilities could serve public interests and needs. Our legislature early on declared all rivers public highways, and, as nothing in the Constitution of 1890 altered its authority to do so, continued this declaration through and including 1988 when, for the first time, it limited waters that are public to such portions thereof as have "a mean annual flow of not less than 100 cubic feet per second."[23] No doubt the traditional functions of commercial navigation import notions of larger bodies of water. Flat boat traders and travelers and even some cotton bearing steamboats of a century ago did not require that much of a river. These other valuable capacities  fishing, logging, and more recently recreation and pleasure boating  require waters of modest size and capacity. It is in this context that we understand the truism that navigable waters are those waters which are navigable in fact. Those waters are navigable in fact which are navigable by loggers, fishermen and pleasure boaters.

E.
The Chancery Court invoked the Constitution of 1890 to declare the Bogue Chitto private, and in doing so, relied heavily on Sections 14[24] and 17[25]. This approach begs the question, for until Landowners show they hold property rights in the River, Sections 14 and 17 are of no force. We think the Court should have begun with a fair reading of Section 81 for that is the only section in our constitution that employs the phrase navigable waters, albeit without defining the phrase.
*1153 Our constitution must govern circumstances and times beyond the prescience of its draftsmen, see, e.g., Alexander v. State ex rel. Allain, 441 So.2d 1329, 1334 (Miss. 1983). This hardly provides license to ignore the history and understanding of the times. Before the Constitution[26] the federal and common law recognized that certain waters were public and could never be appropriated to private use. The Constitution of 1890 reflects this premise:
The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands... .
Section 81 goes on to recognize that one of the purposes for which waters are dedicated to the public is "the safe passage of vessels or logs under regulations to be provided by law." The word "vessels" is open textured, and nothing in the Constitution precludes treating a pole operated flatboat or a modern day pleasure boat as a "vessel."
The historical prominence of our statutory expressions bear emphasis. By 1857 the legislature had declared, "All rivers ... shall be public highways,"[27] and this proviso was brought forward verbatim in 1871 [Miss.Code Art. VII, § 2371 (1871)] and in 1880 [Miss.Code Ch. 23, § 865 (1880)]. This was the only public waters statute on the books at the time of the Convention of 1890, and the late Justice George H. Ethridge has offered that "this section should be considered in construing Section 81 as navigable streams are not defined in the section." Ethridge, Mississippi Constitutions 197 (1928). Another important part of Section 81's political history is Smith & Hambrick v. Fonda, 64 Miss. 551, 554, 1 So. 757, 758 (1887), which recognized as public waters capable of floating logs, presaging the constitution's reference to "safe passage of ... logs." Smith said whether Red Creek was "navigable" and thus public turned on whether in fact it was capable of "transportation of logs." This the Court declared is a question of fact to be determined according to the general criteria
If, for a considerable period of the year, its usual and habitual condition is such that the public may rely upon it as a safe and convenient means of transporting over it the logs which are cut from the forest on its banks; if this condition recurs with the season of our usual rains, and continues through it, even though occasionally interrupted by a decline of its waters,  it is a navigable stream. On the other hand, even though at irregular and uncertain intervals throughout the year, regardless of seasons, it is so swollen by rains that it is temporarily used for purposes of transportation, it is not a navigable or floatable stream in such sense as to entitle the public to an easement over its waters.
Smith, 64 Miss. at 554, 1 So. at 758. Because of its temporal proximity to the Constitution, Smith further informs the meaning of "navigable waters" within Section 81.[28]
Valuable post-1890 expressions provide further insight. In 1892, the legislature modified the "all rivers" act but with no change in effect on today's issue.

All bays, inlets, and rivers, and such of the lakes, bayous, and other watercourses as shall have been, or may be, declared to be navigable by act of the legislature or by the board of supervisors of the county in which the same may be, shall be public highways. [Emphasis supplied].
See Miss. Laws, ch. 82, § 12 (1892), codified as Miss.Code § 3898 (1892). This enactment, like Constitution Section 81, contained no definition of navigability, but it did not need one, for it declared that "All" rivers shall be public highways. It seems sensible that this language should be read as implementing Section 81's mandate, for statutes enacted in temporal proximity to *1154 constitutional utterances inform the meaning of the latter, and vice versa. See, e.g., State Teachers' College v. Morris, 165 Miss. 758, 766-67, 144 So. 374, 378 (1932); State ex rel. Hairston v. Baggett, 145 Miss. 142, 160-62, 110 So. 240, 242 (1926); Cooper Manufacturing Co. v. Ferguson, 113 U.S. 727, 732-33, 5 S.Ct. 739, 740-41, 28 L.Ed. 1137, 1138 (1885); Fairbank v. United States, 181 U.S. 283, 308, 21 S.Ct. 648, 658, 45 L.Ed. 862, 873 (1901); and even Culley v. Pearl River Industrial Commission, 234 Miss. 788, 811-12, 108 So.2d 390, 398 (1959).
It is in this setting that we consider Culley, the case relied upon heavily by the Landowners here and the Court below. Culley declares that "the phrase `navigable waters' ..." draws its meaning from "the time the constitution was adopted,"[29]Culley, 234 Miss. at 811-12, 108 So.2d at 398, and in part this is so, as we have just seen. But Culley erroneously (and inexplicably) ignored the important "all rivers" act, not to mention the Smith & Hambrick "transportation of logs" test. The Culley principle of constitutional interpretation requires first resort to that act closest in time to the adoption of the constitutional language, and this means the "all rivers" act of 1892 and not that of 1896, with its 200-bales-of-cotton steamboat test.
Even so nothing in the 1896 act seen in context aids the cause of the privateers. Where two statutes relate to the same subject matter, common sense would suggest that they be harmonized and read together. Mississippi Public Service Commission v. Municipal Energy Agency of Mississippi, 463 So.2d 1056, 1058-59 (Miss. 1985). This may be done here. The 1892 statute  which became Section 51-1-3  declares public "all bays, inlets and rivers." The statute goes on to say that, in addition, "such of the lakes, bayous and other watercourses as shall have been, or may be, declared to be navigable by act of the legislature ... shall be public highways." Then, in 1896 the legislature enacted what has become Sections 1-3-31 and 51-1-1  the proverbial 200 bales of cotton steamboat test  covering "rivers, creeks and bayous" of a certain navigational capacity.[30] The 1896 act may be sensibly read as the sort of legislative declaration of other "lakes, bayous and other watercourses" as contemplated by the 1892 act. The fact that the 1896 act did not repeal or purport to amend the 1892 act supports this reading. The 1896 act covers "watercourses" the 1892 act did not expressly make public. "Creeks and bayous" of the requisite navigational capacity are not made public by the 1892 act, but these are declared public in 1896, if they can handle steamboats with a carrying capacity of 200 bales of cotton. In this view, we find untenable the suggestion that the 1896 act provides the only criteria for identifying the public waters of the State of Mississippi.[31]
*1155 Had the question whether the Bogue Chitto be open to the public been litigated in  say  1894, there appears no viable basis upon which a court may have denied the claim. Nothing in today's record suggests evolution has altered the River's capacities since that time, so that we ought reach another result.

F.
A further word of today. Pending this appeal the legislature has substantially amended Section 51-1-4's test for what constitutes public waterways and has repealed the "all rivers" act altogether, see Miss. Laws, ch. 598 (1988), and the question is whether the ordinary strictures of private law adjudication mandate that we decide this case under substantially repealed law and say no more. To be sure, were there no public interest involved, such may well be our proper course, but because our decision substantially impacts upon the public interest, precedent suggests we address the intervening legislative action. See State Tax Commission v. Fondren, 387 So.2d 712, 721-22, 724 (Miss. 1980).
In 1988, the legislature enacted a new test for what constitutes public waterways and delegated to administrative competence much of the day-to-day task of determining what waterways meet the test. What is now Section 51-1-4 provides that
Such portions of all natural flowing streams in this state having a mean annual flow of not less than 100 cubic feet per second, as determined and designated on appropriate maps by the Mississippi Department of Natural Resources shall be public waterways of the state... .
The question whether waters be public may ultimately be a judicial question and certainly has a federal foundation. The legislature's 1988 enactment lies within a political tradition dating back at least to 1840, see Howard and Hutchinson, Miss. Stats., ch. 38, § 55 (1840), the original version of the all rivers act. Though the legislature has never sought to preempt the field and provide for all waters whether they be public, see, e.g., Dycus v. Sillers, 557 So.2d 486 (Miss. 1990), we respect and defer to the role it has played.
Applying the new "one hundred cubic feet per second" test to today's case, we find the U.S. Geological Survey introduced into evidence showing a "low water" discharge just above the area in dispute of 188 cubic feet per second, easily exceeding the statutory minimum. Beyond this, we find that on October 19, 1988, the Department of Natural Resources declared the Bogue Chitto River a public waterway from the confluence of Boone Creek in Lincoln County, well above the area here in dispute, south and southeasterly to the Mississippi-Louisiana State Line. We accept the legislatively decreed role given the Department of Natural Resources and see no reason to question its finding that the Bogue Chitto River is a public waterway in the area in question. See, e.g., Melody Manor Convalescent Center v. Mississippi State Department of Health, 546 So.2d 972, 974 (Miss. 1989); Grant Center Hospital of *1156 Mississippi, Inc. v. Health Group of Jackson, Mississippi, Inc., 528 So.2d 804, 808 (Miss. 1988); Mississippi Air & Water Pollution Control Permit Board v. Pets & Such Foods, Inc., 394 So.2d 1353, 1355 (Miss. 1981); see also Young v. Community Nutrition Institute, 476 U.S. 974, 980-84, 106 S.Ct. 2360, 2364-66, 90 L.Ed.2d 959, 966-68 (1986); J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 406-09, 48 S.Ct. 348, 351-52, 72 L.Ed. 624, 629-30 (1928).
Beyond this, nothing present in Section 51-1-4's one hundred cubic feet per second standard offends Section 81 of our Constitution, or any federal standard for what constitutes public waters, emanating from the Equal Footings Doctrine or otherwise, nor does it offend any rights Sections 14 and 17 may secure to riparian landowners.

V.
In their complaint Ryals and Barrett charged that Landowners and Sheriff Dillon had engaged in a civil conspiracy to interfere with Plaintiffs' business enterprises. The parties extensively litigated the issue at trial and in the end, the Chancery Court found that
There was no evidence of Defendants combining for an unlawful purpose or a lawful purpose unlawfully which is required in conspiracy cases. The gravamen of this ultimate finding is the Court's view that no one asked Sheriff Dillon to do anything other than "enforce the law" and that there was no evidence of anyone "blocking ... the river or [of an] arrest being made as a result."
Upon reviewing the record, we may only find that there was before the Chancery Court substantial credible evidence which supported its rejection of Plaintiffs' conspiracy claim. Put otherwise, the Court acted well within the evidence when it held Plaintiffs had failed to meet their burden of proving the elements of a civil conspiracy. In such a circumstance, our scope of review is quite limited. Suffice it to say that we perceive no grounds for reversal on this issue. See, e.g., Williams v. Evans, 547 So.2d 54, 58 (Miss. 1989); In re Estate of Harris, 539 So.2d 1040, 1043 (Miss. 1989); Anderson v. Burt, 507 So.2d 32, 36 (Miss. 1987).

VI.
These things said, we hold that Ryals and Barrett are entitled to a declaratory judgment with respect to the status of the Bogue Chitto River in southeastern Pike County. See Rule 57, Miss.R.Civ.P.; UHS-Qualicare, Inc. v. Gulf Coast Community Hospital, 525 So.2d 746, 753, 758 (Miss. 1987); In re Validation Of $7,800,000.00 Combined Utility System Revenue Bond, 465 So.2d 1003, 1014-15 (Miss. 1985); Alexander v. State ex rel. Allain, 441 So.2d 1329, 1346-47 (Miss. 1983). We hold and declare that in the area in dispute in southeastern Pike County the Bogue Chitto River is a public waterway, such that riparian landowners may acquire no rights in the surface or waters other than those they enjoy as members of the general public,
(1) because, as a matter of law, the River at this point is navigable in fact or with reasonable channel maintenance and dredging;[32] and
(2) because, at this point, the River has a mean annual flow of 188 cubic feet per second and has been designated a public waterway by the Mississippi Department of Natural Resources, thus *1157 conforming to the standards of the 1988 amendments to Section 51-1-4.
To the end that we may quiet the controversy that has raged below, we further declare that Section 51-1-4, as amended in 1988, was within the legislative competence and suffers no constitutional or other infirmity when scrutinized under Sections 14, 17 or 81 of the Mississippi Constitution of 1890 or otherwise, or under federal law, including but not limited to the Equal Footings Doctrine and the congressional enactment of 1817 creating the State of Mississippi.
Nothing said here should be taken to disparage Landowners' concerns of trash and debris, for these offend the interests and sensibilities of us all, only we have other less drastic law adequate to the day. Miss. Code Ann. § 97-15-29 (Supp. 1989). The legislature has addressed the civil liability problem. Miss. Code Ann. § 51-1-4 (Supp. 1989).
Except as herein expressly provided to the contrary, the judgment of the Chancery Court of Pike County shall be, and the same hereby, is affirmed.
REVERSED IN PART AND RENDERED; AFFIRMED IN PART.
PRATHER, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
ROY NOBLE LEE, C.J., dissents by separate written opinion joined by HAWKINS and DAN M. LEE, P.JJ., and BLASS, J.
HAWKINS, P.J., dissents with separate written opinion joined by ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and BLASS, J.
BLASS, J., dissents with separate written opinion joined by ROY NOBLE LEE, C.J., HAWKINS, P.J., and DAN M. LEE, P.J.
ROY NOBLE LEE, Chief Justice, dissenting:
Flowing streams are almost mystical bodies, beginning from nothing, winding like a serpent, growing wider and deeper usually the longer they flow, in their search and eagerness to reach the sea. They may become navigable at some points along their routes.
Leaf River originates in a pasture almost within the city limits of Forest, Scott County, Mississippi. Strong River has its beginning in the northwest part of Scott County. Little Tallahalla Creek's headwaters are in a field north of Sherman Hill in Scott County. It converges with Big Tallahalla. Pearl River begins at Naniwaiyai in Winston County.
These rivers and creeks start from a spring or marsh and grow from branches to sizable streams. They all flow south toward the Gulf of Mexico. In the Hattiesburg area, the Leaf is a large stream that lives up to its name river. In Perry County, Tallahalla Creek is a formidable looking river. The further south the Strong flows, the larger, deeper and wider it becomes. The Pearl grows larger from Edinburg, Leake County, Mississippi, as it winds it way into South Mississippi.
Seventy-five years ago, gasoline boats hauled cargos from Edinburg to Jackson on the Pearl River in high water seasons. Some of the other streams mentioned may have been used for commerce in the early days of our State. Many more areas of those streams were, and are, not navigable and were controlled by the riparian land owners.
As I view the record, the Bogue Chitto River does not qualify under the law as a navigable stream, which would entitle the public to go over and onto private property covered by the river. In my view, a stronger case was made for public use of state waters in Dycus v. Sillers, 557 So.2d 486 (Miss. 1990) than in the present case.
I do not retreat from my concurring opinion in Dycus where I expressed concern about the effect that such decision may have on oxbow lakes and tributaries of the Mississippi River and Pearl River, which had become public bodies. However, I do not view or interpret the record to reflect that the area of Bogue Chitto River involved in this case has been shown to be within the definition of a navigable stream *1158 and a public body of water. Therefore, I dissent.
HAWKINS and DAN M. LEE, P.JJ., and BLASS, J. joins this dissent.
HAWKINS, Presiding Justice, dissenting:
Entrepreneurs Darrell Ryals, Allen Ryals, and Jimmy Barrett, doing business as "Ryals Rentals" and "Bogue Chitto Choo Choo" appealed the dismissal of their complaint for an injunction against Charles Ray Pigott, Glen W. Crawford, Julius O'Quinn, Jr., Otis Ray House, Duane Dillon (the sheriff of Pike County), and others. The Ryals and Barrett operated canoe and inner tube rental businesses for patrons desiring a short excursion down the Bogue Chitto River, and because the sheriff concluded the river was not navigable and the patrons might be trespassing, he warned them that landowners might make such criminal charges. Plaintiffs then sought permanent injunction enjoining the defendants from interfering with their businesses.
The chancellor found no ground for relief and we should affirm.
One of the commandments Moses brought down from Mt. Sinai was "Thou shalt not steal." Thus do the dim mists of history begin with a sacred recognition of right to property, a basic human need.
Have we forgotten that the Revolutionary War was brought about because Great Britain ignored the property rights of her colonists? Read the Declaration of Independence.
If no other, one flaw in the Communist system of government guaranteed its ultimate failure, the absence of any property right by individual citizens.
There are varied ways of taking a person's property, namely: trespass, theft, banditry, robbery, plunder, bald governmental seizure, or by decree to simply deny he ever owned it in the first place. (See, footnote 8, infra, on p. 1167-68.)
As I will presently demonstrate, the majority has ignored settled principles of law in ownership of flowing streams.[1] Ill-will, resentment and distrust by property owners will flow from this decision.

FACTS
This case involves the rights of private owners versus the general public to a portion of the Bogue Chitto River. The portion of the river involved in this lawsuit begins at Holmesville Bridge and continues to the water park that was maintained by Pike County.
Darrell and Allen Ryals own and operate Ryals Rentals. Jimmy Barrett owns and operates the Bogue Chitto Choo Choo. Both of these businesses rent canoes and tubes to the general public to float down the river. Pike County also operates a water park on the river. The park charges a fee for every canoe and tube picked up at the park.
The use of the river in this manner precipitated anger on the part of landowners beyond the area owned by the county. Empty cans, trash, and bottles were strewn on the river banks. Also, a serious accident occurred in which a young man, after climbing out of the river onto land owned by Julius O'Quinn, dove into water which was too shallow resulting in a head and neck injury and paralysis. He sued the county and O'Quinn in the United States District Court. Dumas v. Pike County, Mississippi, 642 F. Supp. 131 (S.D.Miss. 1986). Fear was then added to resentment on part of the landowners.
The landowners complained to Sheriff Duane Dillon. They wanted him to patrol the river and arrest trespassers. The Sheriff initially was of the opinion that the river *1159 was a public waterway and that the public had a right to freely use the river.
Thereafter one of the landowners, Charles Ray Pigott, was prosecuted and convicted in the county court for cutting timber and obstructing the river in violation of Miss. Code Ann. § 97-15-41 (1972). He appealed, and the Honorable Harvey Buck, sitting as special circuit judge, dismissed the charge because the State did not attempt to prove the river at that point was navigable.
When the sheriff read Judge Buck's opinion, he concluded the river was not navigable.
Thereafter the Sheriff, along with several deputies, went to the river and warned potential customers that if they floated down the river they were subject to prosecution for trespassing if the landowners pressed charges.
As a result, Ryals Rentals and the Bogue Chitto Choo Choo experienced a severe drop in revenues, and filed a petition in chancery court for a temporary restraining order and a permanent injunction. The temporary restraining order was granted subject to posting of a bond. The bond, however, was never posted.
On the hearing for permanent injunction, several witnesses testified as to the dimensions of the river. The plaintiffs sought to show that the river was a "public waterway" under the provisions of Miss. Code Ann. § 51-1-4, in effect when the complaint was filed and heard (since amended by Ch. 598, § 1, Laws 1988), which in pertinent part stated:
Such portions of all natural flowing streams in this state having a length of not less than five (5) miles and which have an average depth along the thread of the channel of three (3) feet for ninety (90) consecutive days in the year and which have an average width at low water of not less than thirty (30) feet, shall be public waterways of the state on which the citizens of this state and other states shall have the right of free transport and the right to fish and engage in water sports... .
Charles T. Branch qualified as an expert on water management. Using maps and graphs of the Bogue Chitto River compiled by the U.S. Geological Survey, he testified that the average depth of the river was greater than 4 feet and the average width was greater than 70 feet. Although the study dealt with an area just north of that in question, Branch stated that logically as you go further south, the river's drainage area and flow increases from tributaries. Thus, the channel size of the river would increase to accommodate that flow, becoming larger the closer it got to the Gulf of Mexico. Also, the study was conducted in summer low-water conditions and at some points it still measured in excess of 120 feet across.
J.H. Marsalis also testified as to the dimensions of the river. He had fished the river for over 50 years. He indicated on a map several places where even a small fishing boat could not pass due to sandbars. Furthermore, he stated that he had never known anyone to attempt to float logs down the river.
Finally, Norman O'Quinn testified that he had lived on his property adjoining the river for 72 years and had never known anyone to use the river for logging.[2]
At the conclusion of the hearing, the chancellor held in favor of the landowners. First, he found that no conspiracy existed between the Sheriff and the landowners because the plaintiffs failed to prove that the Sheriff and landowners conspired together to close the river.
The chancellor also held that in order to meet the requirements of Miss. Code Ann. § 51-1-4, then in effect, a river had to have *1160 an exact average depth of three (3) feet  no more, no less, a manifest impossibility.
The chancellor also held that the plaintiffs had not shown that the river was navigable, that there was no evidence to indicate that the river could be used for commercial purposes. Thus, the river was not navigable in fact.
Finally, the chancellor ruled that Miss. Code Ann. § 51-1-4 was unconstitutional because it gave the public the right to enter private property without due process or compensation.
The Ryals and Barrett appealed.

LAW
I agree with the chancellor that no conspiracy was proved, but disagree with his strict interpretation of Miss. Code Ann. § 51-1-4 in effect at the time the complaint was filed (since amended by Ch. 598, § 1, Laws 1988). It is not necessary to address either of these propositions. The chancellor correctly held the statute an unconstitutional taking of private property without compensation, in violation of Art. 3, §§ 14, 17 of the Mississippi Constitution.[3]
The rights of the public versus the landowners revolve around the factual determination of whether the involved portion of Bogue Chitto River is or is not navigable. If navigable there is a public easement of a use of the surface waters; if not navigable, there was no such right in the public.
In charting our course through this stream, it is necessary that we keep our compass bearings upon two basic principles firmly embedded in Mississippi property law:
(1) On navigable waters, "he who owns the bank, owns to the middle of the river, subject to the easement of navigation," Morgan v. Reading, 3 S. & M. 366 (1844); Magnolia v. Marshall, 39 Miss. 109 (1860); Archer v. Greenville Sand & Gravel Co., 233 U.S. 60, 34 S.Ct. 567, 58 L.Ed. 850 (1914), or as further held in Magnolia v. Marshall, supra:
There is therefore no inconsistency, but on the contrary, as before suggested, perfect harmony between the jus privatum [private law; the law regulating the rights of individuals] of riparian ownership in public fresh-water streams, to the middle of the river, and the jus publicum [public law; law relating to the constitution and functions of government] of free navigation thereof. The soil is granted to the riparian proprietor, subject to this public easement.
* * * * * *
This general doctrine is as old as the Year-books, that, prima facie, every proprietor on each bank of a river is entitled to the land covered with water to the middle of the stream. In virtue of this ownership, he has the right to the use of the water flowing over it in its natural current without diminution or obstruction. But, strictly speaking, he has no property in the water itself, but a simple use of it while it passes along. [Emphasis original].
39 Miss. at 122, 124. Quoted in Archer, 233 U.S. at 66-67, 34 S.Ct. at 569, 58 L.Ed. at 852.
(2) On the other hand as to non-navigable waters, Magnolia, supra, 39 Miss. at 116, held, "That rivers not navigable (that is, fresh water rivers of what kind soever) do, of common right, belong to the owners of the soil adjacent." As succinctly stated in Masonite Corp. v. Burnham, 164 Miss. 840, 852, 146 So. 292, 294, 91 A.L.R. 752, 755 (1933), "Tallahalla Creek is not a navigable stream; it therefore belongs to the *1161 riparian owners." Also, Morgan v. Reading, supra, 3 S. & M. at 406; Downes v. Crosby Chemicals, Inc., 234 So.2d 916 (Miss. 1970).
Thus, in Mississippi even as to navigable waters the riparian owners have title to the bed of the river. On non-navigable waters the riparian owners have title to the stream as well, and right of exclusive possession.[4]
The answer to the factual inquiry of whether a flowing stream is or is not navigable has been the determinative factor of whether or not property rights and the right of exclusive possession of the surface waters are vested in the riparian owners. Therefore, if the statutory criteria of Miss. Code. Ann. § 51-1-4 (1972) to constitute a "public waterway" would also make the flowing stream navigable under accepted law, then it would pass constitutional muster; otherwise not. It does not.
The burden of proving that a body of flowing water is navigable is upon the party asserting that fact. Culley v. Pearl River Industrial Commission, 234 Miss. 788, 812, 108 So.2d 390, 398 (1959); Downes v. Crosby Chemicals, Inc., 234 So.2d at 920.[5]
What is factually necessary to show a body of water is navigable?
Before returning to Mississippi it will be helpful to examine the general law as to navigable waters, and its historical background.
The term "navigable waters" began in England several centuries ago, where it dealt with the ebb and flow of the tide. Magnolia v. Marshall, supra.
Under the common law of England, "navigable" waterways were (and are) those in which the tide ebbs and flows  a sound rule for a country in which all rivers of any importance are subject to the tides.
2 R.E. Clark, Water and Water Rights § 101.1(A) (1967).
The English definition of navigable waters, however, was unsuitable for this country. Commissioners of Homochitto River v. Withers, 29 Miss. 21, 37 (1855); Magnolia v. Marshall, supra. In The Daniel Ball v. United States, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), the United States Supreme Court held:
The doctrine of the common law as to the navigability of waters has no application in this country. Here the ebb and flow of the tide do not constitute the usual test, as in England, or any test at all as to the navigability of waters. There no waters are navigable in fact, or at least to any considerable extent, which are not subject to the tide, and from this circumstance tide-water and navigable water there signify substantially the same thing. But in this country the case is widely different. Some of our rivers are as navigable for many hundreds of miles above as they are below the limits of tide-water, and some of them are navigable for great distances by large vessels, which are not even affected by the tide at any point during their entire length. Genesee Chief, 12 How. 457; The Hine v. Trevor, 4 Wall. 555, 18 L.Ed. 451. A different test must, therefore, be applied to determine the navigability of our rivers and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. [Emphasis added]
*1162 Id., 77 U.S. (10 Wall.) at 563, 19 L.Ed. at 1001. Thus, the Court established that "navigability in fact" was based on a commercial test.
The commercial definition of navigability was further discussed by H.P. Farnham in his treatise on water rights.
A navigable body of water is one which the public has a right to use for the purposes of navigation. The term includes all waters which for a period long enough to be of commercial value are of sufficient capacity to float water craft for the purposes of commerce, or to float to market the products of the country through which the water extends, so as to be useful to the population along its banks... . The stream must be of some value for commercial purposes, so as to be useful to trade, commerce, or agriculture. And this excludes waters which are merely capable of floating a skiff for pleasure. And to be useful for these purposes the water must connect with other waters or lead from one public place to another, so as to be in the path of commerce. [Emphasis added]
1 H.P. Farnham, The Law of Waters and Water Rights ch. 3 § 23 (1904).
Furthermore, the commercial test is still being used today.
The classic definition of "navigability" in the "federal sense," followed by many state courts, is the capacity of the stream in its natural state to be employed for useful commerce and travel. [Emphasis added]
Annotation, Public Rights of Recreational Boating, Fishing, Wading, or the Like in Inland Stream the Bed of Which is Privately Owned, 6 A.L.R.4th 1030, 1036 (1981). See, 78 Am.Jur.2d Waters § 62 (1975). See also, Utah v. United States, 403 U.S. 9, 10, 91 S.Ct. 1775, 1776, 29 L.Ed.2d 279, 281 (1971).
The United States placed in the public trust only those waters that were navigable, or in other words, those waters that were commercially usable.
Loving v. Alexander, 745 F.2d 861 (4th Cir.1984), applied the commercial use test in determining whether a river was navigable in fact:
Rivers are navigable "when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." [citation omitted] The extent and manner of use of a navigable river is not important as long as it is usable as an actual avenue of commerce. [Emphasis added]
Id. at 864.
The court then gave criteria which have been used by courts in determining whether or not a river was an avenue of commerce:
Recent disuse due to the development of alternative modes of transport or artificial obstructions will not alter a watercourse's historical navigable status. "When once found to be navigable, a waterway remains so." Applachian Electric, 311 U.S. at 408, 61 S.Ct. at 299. This rule recognizes the reality that many streams which may have supported considerable commerce in their day are now superseded by the trucks and railroads of the modern era. Navigability in fact is not diminished and the power which may be exerted under the commerce clause is not relinquished when a better means of transport is developed.
Navigability is also not destroyed because a watercourse is interrupted by occasional natural obstructions or portages, nor need navigation be open at all seasons of the year, or at all stages of the water. Economy Light & Power v. United States, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921). However, susceptibility of use as a highway for commerce should not be confined to exceptional conditions or short periods of temporary high water. United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931). The condition of the watercourse should be such as to ordinarily assure regularity and predictability of usage. See United States v. Rio Grande Dam and Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).
Navigability is basically a question of fact determined from the particular circumstances *1163 of each case, United States v. Utah, 283 U.S. at 87, 51 S.Ct. at 445, but these are questions of law inseparable from the particular facts to which they are applied. Appalachian Electric, 311 U.S. at 404, 61 S.Ct. at 297. The test of navigability requires a finding of navigability from evidence of anything from "the carriage of ocean lines to the floating out of logs." Appalachian Electric, 311 U.S. at 405, 61 S.Ct. at 298.
745 F.2d at 864-865.
In summary, 65 C.J.S. Navigable Waters § 5(1) (1966), states:
A stream or other body of water is navigable in fact where, and only where, it is of sufficient capacity to be capable of being used for useful purposes of navigation, that is, for trade and travel in the usual and ordinary modes. As otherwise expressed, bodies of water are navigable in fact when they are used or are susceptible of being used in their ordinary condition as highways for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water.... [Emphasis added]

MISSISSIPPI
Article 4, § 81 of the Mississippi Constitution recognizes a public easement on navigable waters, and also suggests a "commercial use" test:
Section 81. The Legislature shall never authorize the permanent obstruction of any of the navigable waters of the State, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of draw-bridges for railroads, or other roads, nor the construction of booms and chutes for logs, nor the construction, operation and maintenance of facilities incident to the exploration, production or transportation of oil, gas or other minerals, nor the construction, operation and maintenance of bridges and causeways in such manner as not to prevent the safe passage of vessels or logs under regulations to be provided by law.[6] [Emphasis added]
Our Legislature in Miss. Laws, ch. 64, § 1 (1896), gave a specific description of "navigable waters," now codified in Miss.Code. Ann. § 1-3-31 and § 51-1-1 as follows:
All rivers, creeks and bayous in this state, twenty-five miles in length, and having sufficient depth and width of water for thirty consecutive days in the year to float a steamboat with carrying capacity of two hundred bales of cotton, are navigable waters of this state and public highways.[7]
In Culley v. Pearl River Industrial Commission, supra, the landowner objected *1164 to constructing a dam upon the Pearl River for what was to be known as the Ross Barnett Reservoir because, by obstructing the river's flow, it violated § 81 "which must be determined according to the meaning of this phrase at the time the 1890 Constitution was adopted." 234 Miss. at 812, 108 So.2d at 398.
Then, although this Court found Miss. Code. Ann. §§ 1-3-31 and 51-1-1 gave a "rather quaint definition of `navigable waters' ... [,]" we went on to hold that before the landowner could complain that the damming of the Pearl River violated § 81, it was incumbent upon him to prove the river came within these statutes' definition:
Moreover, appellants offered no evidence to show that the Pearl River is a navigable water-way within the definition of code Secs. 686 [Miss. Code Ann. § 1-3-31] and 8414 [Miss. Code Ann. § 51-1-1]. The burden of establishing that fact was upon the appellants, and they failed to meet it. 65 C.J.S. Navigable Waters, Sec. 9.
234 Miss. at 812, 108 So.2d at 398.
In Downes v. Crosby Chemicals, Inc., supra, fishermen sought the right to fish on Hobolochitto Creek, and we affirmed the chancery court decree holding ownership and exclusive right of possession in the stream were in the riparian landowner. We noted:
No commercial or other traffic had ever used it as a "water highway" and no boats had been upon it other than those which might be classified as canoes, skiffs or light fishing boats, except that, around the turn of the century only, logs sometimes had been floated down it.
234 So.2d at 920.
We held that navigability in fact depended upon the statutory definition of Miss. Code. Ann. § 51-1-1, and whether or not the body of water supported commercial traffic. We also held that a non-navigable stream in fact could not be taken for public use, without compensation to the riparian landowner, simply by legislative enactment that it was a public waterway.
It will be observed that section 8414 [Miss. Code Ann. § 51-1-1] provides several factors to be considered in determining what streams shall be "navigable waters." To be "navigable waters" under the statute a stream must be at least 25 miles in length, and it must have sufficient depth and width of water for 30 consecutive days in the year for floating a steam boat with a carrying capacity of 200 bales of cotton. We cannot agree with appellants' contention that these criteria are unconstitutionally vague or incapable of exact definition or application. It is apparent that it was the legislative intent to exclude small private creeks and streams, non-navigable in fact, and to declare navigable only streams actually capable of being navigated by substantial commercial traffic.

The reverse of the proposition, that is to say, that the legislature may take for public use private streams or streams not navigable in fact by general statutory enactment, without constitutional compensation has been questioned.
In 65 C.J.S. Navigable Waters § 7b (1966) it is stated:
Statutes declaring that certain streams are navigable are given recognition as far as they do not do violence to the fact, but a legislative act cannot impress the character of navigability on a stream that is in fact not navigable and thus destroy the vested rights of riparian owners, * * *.

*1165 Generally, statutes relating to navigability are given effect in accordance with their terms, and statutes declaring that certain streams are navigable are given recognition as far as they do not do violence to the fact. * * *
* * * * * *
Such statutes, however, do not convert non-navigable streams into navigable waters, and a legislative act cannot impress the character of navigability on a stream that is in fact not navigable and thus destroy the vested rights which riparian owners have in a non-navigable stream, * * *.
While several collateral issues are now raised by appellants the controlling issue, and the issue submitted to the chancellor, was whether or not Hobolochitto Creek was a navigable stream. Upon this depended any right of the appellants to enter upon that portion of it encompassed within the boundaries of appellees' lands against the will of appellees.

In 56 Am.Jur. Waters section 177 (1947) it is stated:
It has been stated that the division of waters into navigable and non-navigable is merely another way of classifying them as public or private, and that navigable waters embrace all bodies of water which are public in their nature.
To the same effect is the following statement from 65 C.J.S. Navigable Waters § 1 (1966).
The term "public waters" is ordinarily synonymous in a legal sense with "navigable waters," as distinguished from "private waters," the term used to designate nonnavigable waters, and it has been stated that a division of watercourses into navigable and non-navigable is merely a method of dividing them into public and private, which is the more natural classification. [Italicized emphasis original; underlined emphasis added]
Downes, 234 So.2d at 919-920. Also, 78 Am.Jur.2d Waters § 68 (1975):
Statutes declaring streams to be navigable have been adopted in many jurisdictions and have been given effect by the courts, the rule being that a state legislature has the power to appropriate by force of its own enactment any flowing stream to the use of the public as a highway, subject, however, to the qualification that if a stream is in fact not navigable, a statute declaring it to be navigable will not make it so in law as against the pre-existing rights of riparian owners, unless compensation is made to such owners for the value of rights so destroyed or injured. While a legislative declaration of the navigability of the stream is not required if the stream is navigable in fact, nevertheless, in the case of a stream which is so navigable, but which is not one of the principal rivers of the state, and the bed of which the state has duly granted to riparian owners, a statute declaring it to be navigable is valid and constitutional, but cannot be held to divest any of the vested rights of such owners. [Emphasis added]
Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 43 S.Ct. 60, 67 L.Ed. 140 (1922); Hood v. Murphy, 231 Ala. 408, 165 So. 219 (1936); People ex rel. Ricks Water Co. v. Elk River Mill & Lumber Co., 107 Cal. 221, 40 P. 531 (1895); Potlatch Lumber Co. v. Peterson, 12 Idaho 769, 88 P. 426 (1906); Murray v. Preston, 106 Ky. 561, 50 S.W. 1095 (1899); Carlson v. St. Louis River Dam & Improvement Co., 73 Minn. 128, 75 N.W. 1044 (1898); State Engineer v. Cowles Brothers, Inc., 86 Nev. 872, 478 P.2d 159 (1970); Ozark-Mahoning Co. v. State, 76 N.D. 464, 37 N.W.2d 488 (1949); Miller v. State, 124 Tenn. 293, 137 S.W. 760 (1911); Boutwell v. Champlain Realty Co., 89 Vt. 80, 94 A. 108 (1915); Allen v. Weber, 80 Wis. 531, 50 N.W. 514 (1891).
The ownership of the stream of the Bogue Chitto River was not in limbo in 1972 when Ch. 361, Laws 1972, Miss.Code. Ann. § 51-1-4 (1972 Code Supp.) was enacted. At that time the riparian owners either had title to and consequent right of exclusive possession of the stream, or simply owned the bed of the river subject to an easement *1166 for navigation by the public on the stream. In re Leonard, 63 B.R. 261, 262 (Bkrtcy.D. Dist.Col. 1986); Atkinson v. Kish, 420 S.W.2d 104, 111 (1967); Estate of McKee, 378 Pa. 607, 108 A.2d 214, 233 (1954); In re Leonard's Estate, 199 Misc. 138, 100 N.Y.S.2d 105, 109 (1950).
Significantly, it was also held in Magnolia v. Marshall, infra:
It has been the chief end and policy of civil society to assign to every thing capable of ownership a legal and determinate owner; to secure common or public rights so far as the interest of the public require; to furnish a proper line of demarcation between these rights, common to all, and those private rights which belong to each individual as his exclusive property; and thus to promote the general peace and harmony of mankind.
Id. 100 N.Y.S.2d at 116.
It is a familiar principle that law abhors a vacuum in ownership, and favors the vesting of title. In In re Leonard, supra, 63 B.R. at 262, the United States Bankruptcy Court said, "equitable title must all times reside somewhere. Apparently the law, like Nature, abhors a vacuum."
It has been very aptly said that "Law, like nature, abhors a vacuum. For this reason it is the prevalent conception that the rights of those succeeding to property upon a death attach immediately, with no intervening hiatus of ownership." Matter of Killough's Estate, 148 Misc. 73, 86, 265 N.Y.S. 301, 317.
In re Leonard's Estate, supra, 100 N.Y.S.2d at 109.
The Legislature, of course, could not by simple legislative enactment divest the riparian owners of title to property they held in 1972 any more than it could validly give any public property belonging to the State to them. Art. 3, § 14; Art. 4, § 95.
The task, then, is to determine ownership of the stream, and the test is as I have given, whether or not the Bogue Chitto River as it flowed through the defendants' land was or was not in fact navigable, was it then or had it been susceptible of traffic for commerce.
The determination of commercial use perhaps presents difficulties, and may be somewhat cumbersome. The definition may also be considered obsolete, Loving v. Alexander, supra, 745 F.2d at 864. The fact remains that it is the definition by which property owners have had the right to stake their claim of ownership of bodies of water in this state, and titles thereto became vested. Neither the Legislature nor this Court has any lawful authority to change it. It is a right of ownership embedded in history.
When this case was heard, under our decisions in Culley, supra, and Downes, supra, before the plaintiffs could claim any public right of way on the Bogue Chitto River, it was incumbent upon them to prove by competent evidence that the river was navigable in fact. The two Ryals and Barrett made no attempt to do so, but sought to prove instead that it met the requirements of Miss.Code. Ann. § 51-1-4 (Supp. 1972). Following the hearing the chancellor factually determined that the river was not navigable in fact, and was not susceptible of commercial use.
It should also be pointed out that no attempt has ever been made to positively prove that the Bogue Chitto River in this particular area is navigable in fact. If the river met the navigability in fact test, then of course the public would have an easement to use the waters. The right of any person or political entity to have this judicially determined cannot be foreclosed by this action. The burden of proving navigability in fact, as noted, is upon the party asserting it. Culley, supra; Downes, supra.
As also noted, Miss.Code. Ann. § 51-1-4, in effect when this cause was heard was amended by Ch. 598, § 1, Laws 1988. We cannot pass upon the constitutionality of the amended act, as this is not before us. Its definition might very well be helpful in determining whether or not the Bogue Chitto River is navigable in fact, is either now or was in the past susceptible of commercial use, but no statute can be used to change the legal meaning of navigability in fact so as to divest title to property without *1167 legal compensation. Downes v. Crosby Chemicals, Inc., supra, 234 So.2d at 920; 78 Am.Jur.2d Waters § 68, supra.

WHERE WE ARE HEADED
It is easy to paint a picture of wholesome delight and pleasure in the enjoyment by the public in floating, swimming, canoeing, fishing, motorboating on the flowing bodies of water in Mississippi, whether they be called streams, creeks or rivers. We can applaud the efforts by the State to make such recreational pursuits available to all our people.
Such a laudable objective must never beguile us, however, into overlooking another attribute of our national character: the inalienable, sacred right of all to possess and enjoy our own property. Art. 3, § 14 of our Mississippi Constitution states: "No person shall be deprived of life, liberty, or property except by due process of law." Amendment V to the U.S. Constitution states in pertinent part: "No person shall be ... deprived of life, liberty, or property, without due process of law; ..." Amendment XIV to the U.S. Constitution states in pertinent part: "... nor shall any State deprive any person of life, liberty, or property, without due process of law; ..."
It is thus plain that the right to exclusively possess and use one's own property acquired honorably and lawfully is just as dear a constitutional right as life and liberty. All three are equally important under our Constitutions. Indeed, all three rights are intertwined, and it is impossible to conceive freedom of any of the three not encompassing the remaining two.
We must never forget our own history, where we came from and what made this Nation. In fact, law can never be fully understood without a knowledge of our history.
Two weeks after Appomattox in Raleigh, North Carolina, when General William Tecumseh Sherman, commander of the Army of the Tennessee, accepted the surrender of the tattered Confederates, he signed a document guaranteeing that upon the ex-Rebels taking an oath of allegiance they would have "rights of person and property." Granting property rights to Rebels infuriated Secretary of War Stanton. Both these men understood what the "right of property" meant to Americans.
The proposition in 16A C.J.S. Constitutional Law § 506 (1984), is stated as well as it can be stated:
The right of private property is a fundamental, sacred, natural, inherent, and inalienable right, the protection of which is one of the most important purposes of government. It is a common-law right, which existed before the adoption of the federal and state constitutions, and is not now dependent on them for its existence... .
The constitutional provisions for the protection of property should be liberally construed in favor of the right of property. Protection of the right to property is not dependent on the value or amount of property held. The right may not be submitted to vote, and depends on the outcome of no election. The right to enjoy property without unlawful deprivation is a personal right, regardless of the property in question.
Precisely when one of these marginal waterways ceases to be private and becomes public is not as easy and simple as land. Indeed, as above noted, the dividing line may be elusive and difficult to determine. It is a fact, however, susceptible of proof in court, and the State's solemn obligation is not to emasculate settled definitions of property by a statute. It is likewise this Court's duty to enunciate the Constitutional limit beyond which the State may not lawfully go.
We must likewise be completely honest, never denominating something public which has historically been considered and accepted as private simply because of popular demand. It is dangerous to whittle away, insiduously and piecemeal, any property rights; it is abominable to do so through intellectual dishonesty.[8]
*1168 I am not unaware that Courts in some states have broadened the definition of navigability in fact to include a rowboat used for fishing or a canoe engaged in purely recreational pursuit. People v. Mack, 19 Cal. App.3d 1040, 97 Cal. Rptr. 448 (3d Dist. 1971); Attorney General v. Hallden, 51 Mich. App. 176, 214 N.W.2d 856 (1974); Nekoosa-Edwards Paper Co. v. Railroad Comm., 201 Wis. 40, 228 N.W. 144 (1929), reh'g denied 201 Wis. 40, 229 N.W. 631 (1930) and aff'd 283 U.S. 787, 51 S.Ct. 352, 75 L.Ed. 1415 (1931). This may very well have met popular demand, and have encouraged tourists, as the majority attempts to do with its decision.
The bed-rock economic well-being of any state, however, is founded on a healthy respect for property rights. There can be no better inducement for investment in our State, by citizens and non-citizens as well, than the solemn asseveration that in this State property rights are indeed sacred.
The right to vote, as of freedom of speech and religion, are not simply words written into constitutions. They are rights deeply embedded in the psyche of every American, which in turn find expression in the United States Constitution, and every state constitution in this land. Any court which tampered with any of these rights would be considered engaging in an act of folly if not madness.
We should not forget that just as deeply embedded in the mind and heart of every American is the belief that he has a natural, God-given right to peaceably enjoy and possess his own property. No court should ever be insensitive to this right so precious to the heart of every American.
The answer, then, to those who want to make public waterways out of streams and rivers which are only navigable by a rowboat or canoe, and which have never been considered navigable in fact, is simple. If there is a public need, declare it and pay the riparian landowners for it.
It would require only a modest investment of public funds to acquire a boating and fishing easement on a small river or creek. If there is indeed a public need for such areas, it would be absurd to contend that a state which raises well in excess of $1 billion in annual tax revenue could not find sufficient funds to add these small areas to its public recreational facilities. This course would promote peace and harmony. It is the course followed by Colorado, where water is much scarcer than in Mississippi, and where tourism plays a much bigger role in the state economy than in our state. People v. Emmert, 198 Colo. 137, 597 P.2d 1025, 6 A.L.R.4th 1030 (1979); Colo. Rev. Stat. § 33-1-105(1)(g) (1984).
We should never forget the counsel of Justice Holmes in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322, 326 (1922): "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and BLASS, J., join this opinion.
*1169 BLASS, Justice, dissenting:
Feeling depressed and saddened at the treatment this Court has given to this matter, and feeling that great damage is being done to the law of the State of Mississippi, the rights of its property owners, and the institution of private property, which is essential to our economy, I must regretfully dissent.
I take it that, at this point, the majority opinion and the dissenting opinions will have been read. I will, therefore, simply address the majority opinion as it is written and point out what I believe to be in error, and what I think the law clearly is.
We must not permit the ownership of real property to be destroyed or diminished by a new definition invented to satisfy the wish of strangers to paddle in canoes or float in inner tubes in the water, outside the public parks of the county or the state. If the state is obliged to meet the need, or mere desire, for additional aquatic recreational areas let it impose the burden on the whole society, not just on those who have bought and paid for the property, part of which my friend would now give away, at no cost to anyone, except, of course, the owner. Rather, let all the people share in the burden by the simple and commonplace route of eminent domain, that we may all unselfishly pay the cost from our common purse.
I do not think the majority shows acceptable reverence for and deference to the institution of private property in a democratic and capitalistic society. If it can be defined away in this fashion we have moved to the Animal Farm[1] and who knows when the definitions will become fixed and stable? Obviously, they never will. At the next public clamor we will again discover that the law was not what we had always thought it was and redefine the part we do not like. In Europe an experiment in public ownership, on-going for seventy-plus years, has just failed. There everything was taken away from the selfish and given to the people, for their use and enjoyment, "to each according to his need." Now the state is trying to give the property back, and to re-teach the citizens to develop and exercise an intelligent self-interest.
The majority opinion, in my judgment, wholly fails to support the conclusion and result reached by any logical argument or by any decision of any court. The several cases cited do not, upon examination, contain any law which would lead one to believe that the waters in question are navigable in fact, or were so navigable in 1817, when this state came into the union.
The majority rejects Culley v. Pearl River Industrial Commission, 234 Miss. 788, 108 So.2d 390 (1959), which holds that the definition of navigable waters is navigability in fact. Culley, 234 Miss. at 811-12, 108 So.2d at 398.
I object to the treatment of the Culley court. The distinguished judges who made up this court when Culley was decided are represented as sacrificing the law on the altar of public clamor for the Barnett Reservoir. Those were able lawyers and professors of law, highly respected, and friends of many of us still here. What they wrote is what they believed and held the law to be. We have no better precedent. Today's majority disregards that and all precedent with which it disagrees.
The basic test for navigability was set out in The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870) as follows:
Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.
*1170 The Daniel Ball, 77 U.S. (10 Wall.) at 563, 19 L.Ed. at 1001.[2]
The law is well settled that property granted to Mississippi in 1817 included beds of navigable waterways. Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co., 429 U.S. 363, 374, 97 S.Ct. 582, 588, 50 L.Ed.2d 550, 560 (1977); United States v. Utah, 283 U.S. 64, 75, 51 S.Ct. 438, 440-41, 75 L.Ed. 844, 849 (1931); Bohn v. Albertson, 107 Cal. App.2d 738, 238 P.2d 128, 131 (1951); Odom v. Deltona Corp., 341 So.2d 977, 988 (Fla. 1976); Olin Gas Transmission Corp. v. Harrison, 132 So.2d 721, 731 (La. Ct. App. 1961). Therefore, an important issue in the instant case is whether or not the Bogue Chitto was navigable in 1817. The majority fails to address this question.
The majority cites Cinque Bambini v. State, 491 So.2d 508 (Miss. 1986), aff'd 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988) several times, but only from dicta, which abounds in that opinion. Cinque Bambini involved the question whether or not land overlaid by water which rises and falls with the tide or which is daily covered and uncovered by the tide, belonged to the state in trust, despite the fact that it was situated in small, discrete, nonnavigable streams. Cinque Bambini, 491 So.2d at 514-17. No title question was before the Court pertaining to lands under nontidal streams in Cinque Bambini.
The majority also cites Shivley v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894) which included a lengthy discussion of the history of public trust lands, but is of no help to the majority position here. On the contrary, both Cinque Bambini and Shivley affirm the point that navigability means navigability in fact. See McGilvra v. Ross, 215 U.S. 70, 78, 30 S.Ct. 27, 31, 54 L.Ed. 95, 100 (1909) (definition of navigable waters as used in Shivley meant waters which were navigable in fact). As discussed supra, navigability is to be determined as of the date of statehood.
Justice Hawkins' opinion clearly sets out the law which pertains to this case. The majority opinion refuses to face the controlling issues. Using Animal Farm techniques of changing the law, it declares that words do not mean what they appear to mean and what we have always thought they meant. Consequently, we suddenly "discover" that landowners do not own what they have long been said to own and have always thought they owned.
We are dealing here with a tract of land through which a fresh water non-tidal stream flows. The question is whether or not the public may go up and down the stream, on privately owned land, without the landowner's permission. The answer turns upon whether or not the public has an easement which gives it the right to go across the land. The landowners have granted no such right. How, then, may such a right be claimed? The public would have such a right if the lands are "public trust" lands. What are "public trust" lands, and what is the source of their title? When were they identified? Although its actual decision was limited to lands affected by the tides, we need look back no further than 1984 to find these questions discussed by this Court in dicta in Cinque Bambini. Since the majority opinion cites the case for law dealing with non-tidal waters, we feel free to so indulge.
Public trust lands are lands which are subject to the ebb and flow of the tides or the beds and banks of non-tidal waters which were navigable-in-fact when the state was admitted to the union. These lands were given to the states when each state was admitted to the union. In our case this was on March 1, 1817. In the non-tidal area it is important to note that only those water bottoms under streams which were navigable in fact in 1817, in Mississippi, were granted. The grant was made by the United States and was complete when the union admitted the state. Borrowing from the Book of Genesis, "[t]his act of creation consummated, the *1171 federal sovereign rested." Cinque Bambini, 491 So.2d at 517.
The Court went on to point out, correctly, that the State of Mississippi adopted the common law rule that riparian owners, adjacent to all non-tidal streams, own to the center, or, more precisely, to the thread of the stream. This rule applied to both navigable-in-fact and non-navigable streams. Under the navigable streams the landowner took the land subject to the common law easement for navigation and other uses incidental thereto. The identity of these streams and the definition of "navigable" are questions controlled by federal law, and are also real property questions because they go to the issue of what the states received and what they could convey. Most states retained title to the lands under these navigable waters, subject, even in the state's hands, to the navigation easement, but this state followed the old common law rule, as we have said, and gave the bottom to the landowners. In Cinque Bambini this Court said "We regard as settled the proposition that, insofar as federal law is concerned, the identity of properties granted by the United States in trust became fixed at the time of statehood." Id. at 513 (citations omitted).
From the foregoing it is evident that any inquiry as to whether or not the state received any interest in these waterways, so as to afford to the public any right of entry on the waters over the lands in question must necessarily turn upon whether or not the waters were navigable in 1817. One who claims that a stream is navigable in this sense has the burden of proving it. Culley v. Pearl River Indus. Comm'n, 234 Miss. 788, 812, 108 So.2d 390, 398 (1959). This point, alone, resolves this litigation because this record is devoid of any evidence as to the status of these waters in 1817. The record does not even show, for example, whether the surveyors of the United States meandered or crossed the river, a most fundamental starting point in addressing the navigability of waters in the early days of this country. There being no evidence to support the claim of navigability based on the condition of the river in 1817, the majority opinion is manifestly in error in reversing and rendering. In doing so, this Court arrogates to itself powers denied it under the Constitution, as Justice Hawkins has pointed out. In sum, the Court is making a title decision without any evidence, repeat, without any evidence whatsoever, to support it.
Justice Hawkins has adequately discussed the meaning of the word "navigable." The definition is positively a question of federal law, as to title, and is determined by the susceptibility of the waters for use as a highway of commerce. As he has pointed out, a few states have broadened the definition, erroneously, in my opinion, to include purely recreational uses. I have found only four in my research, which do so.[3]
Conversely, Michigan, whose Court of Appeals had leaned toward the broader view, now holds to the original and federal view as evidenced in Bott v. Natural Resources Commission, 415 Mich. 45, 327 N.W.2d 838 (1982) as follows:
The established law of this state is that the title of a riparian or littoral owner includes the bed to the thread or midpoint of the water, subject to a servitude for commercial navigation of ships and logs, and, where the waters are so navigable, for fishing.
Bott, 415 Mich. at 60, 327 N.W.2d at 841 (footnotes omitted).
In response to an argument that recreational use should be included in the definition or in the permitted uses the Michigan Supreme Court said:
The rules of property law which it is proposed to change have been fully established for over 60 years, and the underlying concepts for over 125 years. Riparian and littoral land has been purchased in reliance on these rules of law, *1172 and expenditures have been made to improve such land in the expectation, based on decisions of this Court, that the public has no right to use the waters not accessible by ship or wide and deep enough for log flotation and that ... the only recreational use recognized by this Court as an incident to the navigational servitude is fishing.
The Legislature can, if it is thought to be sound public policy to enlarge public access to and the use of inland waters, pass laws providing for the enlargement of the rights of the public in those parts of the state where the Legislature finds that there is a shortage of public access to inland rivers and lakes and for the compensation of landowners affected by the enlarged servitude.
Id. at 61-63, 327 N.W.2d at 841-42.
Of similar import is a well-reasoned 1979 opinion of the Supreme Court of Colorado. People v. Emmert, 198 Colo. 137, 597 P.2d 1025 (1979). Here trespassers were arrested floating on the river across a landowner's land without permission. They were convicted of third degree trespass, and appealed. The Supreme Court held that the defendants had no right to float on any non-navigable natural stream as it flowed within the boundaries of privately owned property without first obtaining the consent of the owner of the property. The Court held that the owner of the surface has the right to control everything above it, subject to an aircraft exception, and that one who enters the space above the surface without permission of the owner, whether it be for fishing or other recreational purpose, commits a trespass. In response to the argument that the statutes declared the water of the stream to be the property of the public, the Court said that was intended to preserve the water appropriation system of the state and not to give the public access to the waters for purposes other than appropriation for irrigation purposes. The opinion concludes, "[w]e hold that the public has no right to use the waters overlying private lands for recreational purposes without the consent of the owners."
The majority opinion says that the Bogue Chitto is "perceived" as a public river and includes a footnote that the Mississippi R & D Center published an article on outdoor recreation citing the river as one presenting potential opportunities for water recreation. I am distressed to see real property rights turn on such "perceptions" and hang by such slender threads.
In essence, this Court has ignored or abandoned basic common law property rights by impliedly adopting a recreational-boating test of navigability. The majority has augmented the right of the public at the expense of the private property owner. Dissenting, we assert that each of the property owners along the Bogue Chitto is entitled to compensation. To hold otherwise would amount to a taking by the state of private property without just compensation in violation of the fifth amendment to the U.S. Constitution and Mississippi Constitution art. 3, sec. 17. This is the holding of Kaiser Aetna v. United States, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) wherein the United States Supreme Court held that landowners, whose properties surrounded a pond which had been made navigable through artificial means, were entitled to just compensation under the fifth amendment if they were denied the right to exclude the public. Kaiser Aetna, 444 U.S. at 179-80, 100 S.Ct. at 392-93, 62 L.Ed.2d at 346. Determinable factors which the Court considered were (1) the pond in its natural state was not navigable; (2) the pond, prior to the improvements, had been considered private property; and (3) the question of the landowners' loss of their right to exclude others. Id. at 176, 100 S.Ct. at 391, 62 L.Ed.2d at 344. The Court held that the landowners could not be deprived of this valuable property right except by the exercise of eminent domain, awarding them compensation for the loss of this right. The majority's answer to factor number (3) is shocking. The landowners will no longer be able to exclude others from their land, an essential element of ownership. We have taken their property and have not paid them.
Part III of the majority opinion first commences with considerations that have nothing *1173 to do with the case sub judice and then proceeds immediately to a misconstruction of Lord Hale's De Jure Maris, written in 1667, and the decision of this Court in Steamboat Magnolia v. Marshall, 39 Miss. 109 (1860). In the first place, the length of the river is of no consequence and the issue here is whether or not the river was navigable in 1817, long or short.
With deference to my learned friend who says that the Bogue Chitto is "no small river," I would assert, positively and categorically that is precisely what it is. Steamboat Magnolia does indeed quote from De Jure Maris, but the majority does not read far enough into the document. Lord Hale distinguishes streams and rivers as follows: "there be some streams or rivers that are private, not only in propriety or ownership, but also in use,  as little streams and rivers that are not a common passage for the king's people." 1 H. Farnham, The Law of Waters and Water Rights § 23e (1904) (quoting De Jure Maris ch. 3). See also Steamboat Magnolia, 39 Miss. at 121. It is perfectly clear that the Bogue Chitto is a little river and is not a "common passage" for the public.
Steamboat Magnolia, quoted in footnote 4 of the majority opinion, did indeed incorporate into the law of this state the rules for deciding whether the rivers are public or private. However, the majority overlooks the whole burden of the argument in Steamboat Magnolia where this Court stated that, at common law, "navigable" was used in connection with coastal waters, free by international law to be navigated by ships of all nations at peace with the sovereign, and not to the capacity of the stream for navigation. Id. at 117. At common law a navigable river meant only that part of the stream debouching into the sea in which the tide ebbs and flows. Id. at 119-20. The learned justice, in Magnolia, went on to hold that with respect to fresh water streams, the banks and bottoms belong to the riparian owners, subject to a public easement to navigate those streams that were in fact navigable. Id. at 116-22. Those would be streams under De Jure Maris which would form a part of the "King's Highways." Whatever you may say about the Bogue Chitto it is certainly not a part of the state's highways.
The majority also puts great emphasis upon the average depth of the river by arguing that the river, just above the area in question, has an average depth of four feet and an average width of greater than seventy feet. This is wasted space and effort in that those discussions add nothing to the resolution of the problem. When I was thirty-one or thirty-two, I dove from the old highway bridge into Red Creek in Stone County. The bridge was high and the water was about fifteen or eighteen feet deep. About thirty feet downstream my four small daughters, all under ten years, played in water eight to ten inches deep. The average would be about nine feet, far over the heads of the children, but they played safely, unaffected by the average. Similarly, a boat, to navigate, has to float over the shallowest depth. Its draft is as great in the shallow water as in the deep. When it hits bottom it cannot navigate. The discussion about average depth or width is pointless.
The frightening thing about the majority opinion is that it takes long leaps across great vacant spaces in the record. For example, it says that without a doubt the Bogue Chitto River could support travel by the once familiar flat boats. If we may be permitted to take the same leap, we say that without a doubt it could not. These boats, heavily laden, constructed of heavy materials, weighed tons and could not be portaged across the narrow and shallow places. This river could not be and was not used like the Mississippi, or the Pearl, for example.
Furthermore, almost all of our rivers, creeks, and streams could be used for floating logs in flood time. Logs were cut and laid aside in the woods to await high water. On occasion small dams were erected to enhance the flooding of certain areas, and broken open to permit the rafted logs to be debouched into the swollen streams. While this was a common practice all over the piney woods of South Mississippi, it did not make these little creeks navigable rivers. Gathering to myself for the moment the *1174 same privilege indulged by the majority, I would point out that neither Red Creek nor Wolf River are by any stretch of the imagination considered navigable in their upper reaches. However, in the early days of this state, both were used to float logs during the flood season. We do not have before us the question of whether or not boats may move up and down these waters during flood times, so, properly speaking, the condition of the streams during flood stages is immaterial.
The majority refers to the constitutional prerogative of purging the channels of obstructions to navigation, referring to the Mississippi Constitution, art. 4, sec. 81. We invite attention to the fact that art. 4, sec. 81 applies only to waters which were navigable in the first place. This record contains no information to show that the Bogue Chitto has ever been any more navigable than it is now. If it is silted and blocked in some areas now, it was very likely blocked and silted in those areas when the State of Mississippi came into existence.
Under paragraph IV, the majority opinion incorrectly states that the chancery court correctly observed that a navigable stream is in effect public property while a non-navigable stream belongs to the owner of the land through which it flows. See Steamboat Magnolia, 39 Miss. 109, 124 (1860) (landowner has no property interest in the water, only use of it). This is a perfect illustration of the confusion characteristic of the majority opinion, though part of the statement is correct. All the flowing waters in the creeks and rivers of this state constitute a natural resource which is subject to appropriation pursuant to statutory rules adopted by the Mississippi Legislature. This is true whether the stream is navigable or non-navigable. The waters may be diverted and devoted to private use only pursuant to the statutory plan adopted by the legislature. The banks and bottoms of the non-tidal streams, both navigable-in-fact and non-navigable, belong to the owner of the lands on either side. If the stream flows through the land of a single landowner, then the entire bottom of the stream and both banks belong to that landowner. If the stream forms the boundary between two property owners, then each owns to the thread of the stream. Steamboat Magnolia, 39 Miss at 131. Neither of them owns the stream. Id. at 124. Owning the land, however, and the bottom of the stream, the landowner has the right to control it unless it is navigable-in-fact. The only right the public has with respect to physical invasion of that territory is to navigate upon the water if it is navigable-in-fact. This rule is at least older than De Juris Maris when Lord Hale stated it in 1667.
Without doubt, the opinion designated as the majority opinion flies in the face of old and established property law of this state and defies the force and effect of the federal definition. Whether the water was navigable-in-fact in 1817 and under the federal definition is the test and measure of what the state, and, consequently, the public received. Patently, the majority opinion is wrong and ought not be handed down by this Court. I join Justice Hawkins and the Chief Justice in dissenting.
ROY NOBLE LEE, C.J., and HAWKINS and DAN M. LEE, P.JJ., concur.

ON DENIAL OF PETITION FOR REHEARING
PRATHER, Justice, for the Court:

I. INTRODUCTION
On November 28, 1990, this Court held in favor of the appellants that: (1) the Bogue Chitto River in southeastern Pike County is a public waterway; and (2) riparian landowners, including the appellees, "may acquire no rights in the surface or waters other than those they enjoy as members of the general public." See 580 So.2d at 1149. The appellees subsequently filed a "PETITION FOR REHEARING" and presented two issues for disposition:
1. Whether Justice Edwin L. Pittman should have recused himself from the decision-making of this case?

*1175 2. Whether the Bogue Chitto River is a private waterway and, if so, whether riparian landowners may acquire rights in this waterway?

II. ANALYSIS

A. Issue # 1
This case originated in the Pike County Chancery Court at the time when Justice Pittman served as Mississippi's Attorney General. The appellees contend that, because the Office of Attorney General submitted a brief as amicus curiae "to assist" the chancery court in the disposition of the case, Justice Pittman should be disqualified from participating in this appeal. The appellants counter that the issue is waived for failure to raise it in a timely manner and, alternatively, the issue is devoid of merit.
This Court has perused the record and briefs and finds that the appellees wholly failed to raise this issue until now. The appellees explain the untimeliness:
This appeal was perfected on April 8, 1988. The brief of appellant was mailed for filing on January 6, 1989, approximately three days after Judge Pittman took his seat on the Supreme Court. Appellant's certificate of interested parties did not mention the state attorney general as an interested party. The appellee's certificate of interested parties was filed on March 3, 1989 and named Hon. Mike Moore, then serving as Attorney General of Mississippi, as the interested party. On March 3, 1989 appellees were frankly unaware that Judge Pittman had so recently been elevated to the Supreme Court bench. Moreover, appellees then thought that naming the attorney general who was then in office was the correct procedure to follow in light of the circumstances then known to appellees.
This Court simply does not accept this explanation. At the very least, parties are expected to know the Court's composition and reveal any information which might warrant a justice's recusal from the case. A party who fails, through wilful ignorance or otherwise, to timely apprise itself of such critical information waives the right to have the issue addressed on the merits. This principle of well-entrenched law is designed particularly to nullify the "rewards" of "sandbagging" through employment of dilatory tactics.[1]See, e.g., Keppel v. BaRoss Builders, Inc., 7 Conn. App. 435, 509 A.2d 51, 55-56 (1986) ("Counsel for the defendant did not voice the issue of disqualification until it became clear that his most important witness ... would not testify. This is the very `sandbagging' technique that [this] court [has] discountenanced."); Crawford v. State, 617 S.W.2d 925, 938 (Tex. Crim. App. 1980) ("The waiver leg rests on the theories that defendants should not be allowed to `sandbag' trial judges and that counsel may deliberately choose, for tactical reasons, to waiver certain rights.") (Roberts, J., dissenting); Boulware v. State, 542 S.W.2d 677, 681 (Tex. Crim. App. 1976) ("The issue with which we are faced here can only be resolved against appellant's contention. To do otherwise would allow counsel two, if not more opportunities to obtain an acquittal. It would allow defense counsel to purposely `sandbag' the trial judge into error if he received an adverse verdict.").
As poignantly noted long ago in McCune v. Commercial Pub. Co.:

*1176 Courts are not to be trifled with in such matters. Judges do not have any desire to sit in cases where they are disqualified for any reason, and it is only fair that notice be given the judge of any such disqualification before he hears the case so that he may recuse himself. Any other rule might result in an unfair advantage being taken in a case where an attorney, who moves against a judge, might wait until after he could ascertain whether the decision would be for or against him; and, if against him, he would file a motion to recuse, but if for him, he would accept it without complaint.
148 Miss. 164, 172, 114 So. 268, 269 (1927). In a related law review article, the editors of "American Law Reports Annotated" summarized their research accordingly:
Statutory and common-law rules providing for the disqualification of judges for certain causes reflect a desire to insure that litigants have a fair and impartial trial. On the other hand, time and waiver provisions of such rules reflect a desire to dispatch cases swiftly, conveniently, and without undue expense... .
... .
... [I]n a number of cases it was apparent that attorneys made an objection to a judge long after the facts of disqualification became known and then only for the purposes of delay or to avoid an unfavorable ruling or decision. To hold an objection in reserve for ulterior reasons such as those mentioned not only does a disservice to the client in that the objection when made might be too late and the client forced to appear before a partial judge, but also it is a breach of counsel's duty to the court and to the other party in that a late objection often results in delay, inconvenience, and unnecessary expense.
Annotation, Time for Asserting Disqualification of Judge, and Waiver of Disqualification, 73 A.L.R.2d 1238 (1960), updated in LATER CASE SERVICE, 73 A.L.R.2d 187 (1986 & 1990 Supp.); see also Madsen v. Prudential Federal Savs. & Loan Ass'n, 767 P.2d 538, 542 (Utah 1988) ("A party who has a reasonable basis for moving to disqualify a judge may not delay in the hope of first obtaining a favorable ruling and then complain only if the result is unfavorable."); State v. Kohn, 731 S.W.2d 840, 842 (Mo. 1987) ("[A] party who unduly delays the filing of a motion to disqualify ... waives his right... . Such rule is necessary in order to prevent the unnecessary burden upon judicial administration caused by an unreasonable delay and to prevent a party from disqualifying a judge after first determining the judge's inclination on the merits."); Reilly by Reilly v. Southeastern Penn. Transport'n Auth., 507 Pa. 204, 489 A.2d 1291, 1300 (1985) ("Once the trial is completed with the entry of a verdict, a party is deemed to have waived his right to have a judge disqualified, and if he has waived that issue, he cannot be heard to complain following an unfavorable result."); Sebring v. Colver, 649 P.2d 932, 935 (Alaska 1982) ("To allow [a party] to challenge [a judge's qualification] merely because his rulings ... were not as favorable as [the party] had desired would subvert the purpose of the waiver provision."); In re Estate of Carlton, 378 So.2d 1212, 1218 (Fla. 1979) ("Allowing a party to request disqualification after a decision has been rendered by the Court provides a second opportunity to achieve a favorable result when the first decision is adverse, an opportunity not available to the opposing party."); State v. Cline, 366 P.2d 441, 442 (1961) ("The question of timeliness of filing an affidavit of disqualification has been before the court on numerous occasions, and we have specifically held that a litigant cannot experiment with the judge and, upon encountering an adverse ruling, file an affidavit of prejudice.").
In sum, the appellees knew, or should have known, about Justice Pittman's membership on this Court when they filed their brief. Assuming arguendo that the appellees did not know, then certainly they must have acquired this information sometime after they had filed their brief and prior to the final disposition of this case. The appellees had ample opportunity to show good faith and apprise this Court of information which might have led to Justice *1177 Pittman's recusal; instead, they decided to "rest on their oars" until after this Court rendered its judgment. See Pierce v. Tharp, 224 Tenn. 328, 461 S.W.2d 950, 953-54 (1970) ("[P]etitioners preferred to rest on their oars until the Court announced its decision, and then come forward with a belated effort to charge that some of the justices on the Court were disqualified to hear the case. If any member of the Court were disqualified to participate in the hearing, such [issue] was waived by failure of petitioners ... to make objection.").
Under these facts, the issue is deemed untimely and therefore waived.[2]See City of Biloxi v. Cawley, 332 So.2d 749, 750 (Miss. 1976) ("[A] party desiring to suggest the disqualification of a judge must do so before the trial of the case or as soon as counsel knows [or should have known] of the facts of disqualification."); see also Murray v. Timberlake, 564 So.2d 885, 891 (Ala. 1990) ("Murray's failure to [timely] object to the judge's participation in the case constitutes a waiver of that objection."); In the Matter of the Welfare of M.D.O., 462 N.W.2d 370, 379 (Minn. 1990) ("The failure to raise and preserve [a recusal] issue before the court of appeals constitutes a waiver in a subsequent appeal to this court."); Goode v. State, 574 A.2d 263 (Del. 1990) ("[We agree] that review of this contention is barred since it was ... raised for the first time on appeal."); Romine v. State, 251 Ga. 208, 305 S.E.2d 93, 96-97 (1983) ("[A] motion to recuse ... must not only be legally sufficient, but timely, i.e., made `as soon as the facts demonstrating the basis for disqualification become known.'"); Buckholts Independent Sch. Dist. v. Glaser, 632 S.W.2d 146, 148 (Tex. 1982) ("The taxpayers waived any error [for failing] to file a [timely] motion to recuse."); Cameron v. Cameron, 187 Conn. 163, 444 A.2d 915, 918 (1982) ("Even where a proper ground for disqualification exists, it must be asserted seasonably or it will be deemed to have been waived."); Carpenter v. State, 223 Kan. 523, 575 P.2d 26, 29 (1978) ("If a litigant has reason to believe the judge is prejudiced ... [f]ailure to act on the knowledge becomes a waiver of his right to make the challenge."); Leavitt v. District Court, 172 Mont. 12, 560 P.2d 517, 521 (1977) ("The attempted disqualification [on] the day of trial, came much too late and was properly stricken."); State ex rel. Rathe v. Jefferson Parish Sch. Bd., 206 La. 317, 19 So.2d 153, 172 (1944) ("[I]t was the defendant's duty to file a motion to recuse immediately after the facts were known to him, and the failure to file the motion in time was a waiver of his rights.").

B. Issue #2
The petitioners also reiterate their contention that the Bogue Chitto River is a private waterway and that riparian landowners should be entitled to certain property rights in this waterway. On the basis of the analysis contained in Ryals, at 1144-1157, this Court reaffirms its holding that the petitioners' contention is devoid of merit.

III. CONCLUSION
For the foregoing reasons, this Court denies the "PETITIONS FOR REHEARING."
PETITIONS FOR REHEARING DENIED AS TO "ISSUE #1": ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, SULLIVAN and PITTMAN, JJ., concur.
DAN M. LEE, P.J., dissents.
BANKS and McRAE, JJ., not participating according to Supreme Court internal rules.
PETITIONS FOR REHEARING DENIED AS TO "ISSUE #2": ROBERTSON, SULLIVAN and PITTMAN, JJ., concur.
HAWKINS, P.J., dissents by separate written opinion, joined by ROY NOBLE LEE, C.J., and DAN M. LEE, P.J.
*1178 BANKS and McRAE, JJ., not participating according to Supreme Court internal rules.
HAWKINS, Presiding Justice, dissenting in part and concurring in part:
On the merits I would grant the Petition for the reasons set forth in Justice Blass's and my dissents to the original opinion.
I do concur in denying the Petition on the asserted ground that Justice Pittman should recuse himself, but for a different reason than given by the majority.
This Court has not been chary in delivering stern messages on judicial probity to other courts. Nor have we, for them, set a second-best standard. We have said that a judge must not only avoid judicial conduct improper in fact, but judicial conduct which in the mind of reasonable persons could, not should, have an appearance of impropriety. Haralson v. Haralson, 483 So.2d 378, 380 (Miss. 1986).
Our pronouncements for the most part have been directed to justice court judges, of which In re Coleman, 553 So.2d 513 (Miss. 1989); In re Bailey, 541 So.2d 1036 (Miss. 1989); In re Chambliss, 516 So.2d 506 (Miss. 1987), are illustrative. Yet, a chancellor and circuit judge have likewise received lectures from us. Haralson; Jenkins v. Forrest County General Hospital, et al., 542 So.2d 1180 (Miss. 1989).
In Jenkins we reversed a summary judgment in favor of the defendants because the circuit judge was a brother of a member of a law firm representing the hospital defendant and physicians had supported the judge in his campaign for office. Citing Rutland v. Pridgen, 493 So.2d 952 (Miss. 1986), we held that "a judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." 542 So.2d at 1181.
Thereafter, we took the extraordinary action of removing that same circuit judge from trial of a pending case because again his brother was a member of the law firm representing the hospital, one of the defendants. In re Moffett, 556 So.2d 723 (Miss. 1990).
We can give no better lesson in judicial rectitude, however, than our own example.
This Court poignantly noted in Thompson v. Kreutzer, 112 Miss. 165, 72 So. 891 (1916):
Ownership is not a privilege conferred by government, but is one of the rights which governments were organized to protect. (Emphasis added)
This is a momentous case. Sacred property rights riparian landowners had for over a century considered guaranteed to them by law have been found by a 5-4 vote of this Court an illusion. Had one member of the majority abstained from participating, the chancery court judgment in favor of the landowners would have been affirmed. These particular landowners would have kept their property. Beyond this, even though only on a 4-4 vote, the affirmance would have stood as precedent for preserving property rights in similar cases. Montgomery Ward & Co. v. Harland, 205 Miss. 380, 38 So.2d 771 (1949). Illustrative 4-4 decisions from this Court are Matter of Boundaries of City of Jackson, 551 So.2d 861, 870 (Miss. 1989); Burrell v. Mississippi State Tax Com'n., 536 So.2d 848 (Miss. 1988); Pearl River Valley Water Supply v. Hinds County, 445 So.2d 1330 (Miss. 1984).
During Justice Pittman's distinguished tenure as Attorney General, that office participated in the chancery court proceeding of this cause. The Honorable Helen Wetherbee, special assistant attorney general, filed an amicus brief which stated in part: "Edwin Lloyd Pittman, Attorney General of the State of Mississippi, submits this brief as amicus curiae to assist this Honorable Court in resolving the question of the constitutionality of the above named statute." Brief dated December 4, 1987, p. 1.
In fairness to the landowner movants it should also be pointed out that this was not a brief the Attorney General's Office was required by statute to file, such as briefs on behalf of the State in criminal cases. This was a purely civil action by private litigants in chancery court. The office of the Attorney General could have abstained *1179 from any participation. It chose to participate, and one would presume only after intra-office discussion and deliberation. This choice no doubt was motivated by a strong sense in that office that the statute should be upheld as constitutional. This was the decisive issue on this appeal.
The movant landowners urge that at the very least a reasonable person "would harbor doubts about his impartiality," that there is at the least an appearance that as Justice he already had made up his mind when this case came before us on appeal.
I am completely comfortable in the conviction that Justice Pittman in fact was impartial and voted his honest and sincere judgment.
In this Court, except for the rare and exceptional "dog-fall," one side or other always loses. Any litigant, therefore, knows he can lose. But if he loses, at least he is entitled to the confidence that the fight was fair. He is entitled to know that each Justice who considered his case had no personal, political or pecuniary axe to grind, either directly or indirectly. He is entitled to know that each Justice began the review of his case with a completely open mind. He is entitled to know that the processes of the Court have not been manipulated, stonewalled or jimmied to reach a particular result, and that every Justice who should participate did in fact do so, and any Justice who should not did not. It has been said, "We may only hope the public's respect for the legal process may match the reverence each of the nine Justices of this Court has rendered it."
If we cannot set this example in our own conduct, then I assure my colleagues the reservoir of respect the thinking public has for this Court will be drained. Then our platitudes on honor and ethics will be given credence only by the gullible and credulous.
Nor can I rest comfortable with the majority's holding that the movants somehow have "waived" their right to raise a question as to a member of this Court's interest or impartiality. Determination of matters pertaining to the honor and integrity of this Court should not rest upon technical niceties or niggling. Moreover, the authorities cited are, with one exception, dealing with trial judges who had concluded a case before their personal fitness to hear the case was raised. An entirely different set of facts is presented when a trial judge has concluded a trial than when an appellate court has handed down its initial decision. The only cited case involving an appellate court, Pierce v. Tharp, 224 Tenn. 328, 461 S.W.2d 950, 953 (1970), is distinguishable. First, the question of impropriety was raised, not in a routine petition for rehearing or its Tennessee equivalent, but in a collateral attack on the decision. Also, there would have been sufficient votes to reach the same result without the participation by the questionable justices. The challenged opinion had received the unanimous vote of the court.[1]
I nevertheless concur in the majority's overruling the landowners' motion. In my view this is basically a decision for the Justice concerned to make, and upon which I must place special emphasis here for the reason that my own partiality in judging this issue could be suspect because I dissented from the original majority opinion.
ROY NOBLE LEE, C.J., and DAN M. LEE, P.J., join this opinion.
NOTES
[1] At the time of trial and at this time, Miss. Code Ann. § 1-3-31 (1972) read(s) as follows:

Navigable waters.
All rivers, creeks and bayous in this state, twenty-five miles in length, and having sufficient depth and width of water for thirty consecutive days in the year to float a steamboat with carrying capacity of two hundred bales of cotton, are navigable waters of this state and public highways.
Inexplicably, a near verbatim version of Section 1-3-31 appears as Miss. Code Ann. § 51-1-1 (1972).
[2] At the time of trial, Miss. Code Ann. § 51-1-3 (1972) read:

Navigable waters as public highways.
All bays, inlets, and rivers, and such of the lakes, bayous, and other watercourses as shall have been, or may be, declared to be navigable by act of the legislature or by the board of supervisors of the county in which the same may be, shall be public highways.
After trial, Section 51-1-3 was repealed. See Miss. Laws, ch. 598, § 2 (1988), effective May 25, 1988.
[3] At the time of trial, Miss. Code Ann. § 51-1-4 (Supp. 1987) read as follows:

What constitute public waterways; rights therein.
Such portions of all natural flowing streams in this state having a length of not less than five (5) miles and which have an average depth along the thread of the channel of three (3) feet for ninety (90) consecutive days in the year and which have an average width at low water of not less than thirty (30) feet, shall be public waterways of the state on which the citizens of this state and other states shall have the right of free transport and the right to fish and engage in water sports; provided, however, such person exercising the rights herein granted shall do so at his own risk and such persons shall not be entitled to recover any damages against any person, firm or corporation for any injury to or death of persons or damage to property arising out of the exercise of rights herein granted unless such persons would have been entitled to recover such damages against such person, firm or corporation under the laws of this state prior to the enactment of this act provided that nothing herein contained shall authorize the persons, firms or corporations utilizing said public waterways, under the authority granted hereby, to launch or land any commercial or pleasure craft along or from the shore of such waterways, except as may be otherwise authorized by law. Provided, further, that except as otherwise provided by law nothing herein contained shall authorize any person, form or corporation utilizing said public waterways, under the authority granted hereby, to disturb the banks or beds of such waterways or discharge any object or substance into such waters or upon or across the lands adjacent thereto.
Section 51-1-4 has been substantially amended. See Miss. Laws, ch. 598, § 1 (1988) (effective May 25, 1988).
[4] Luke Ward Conerly in his History of Pike County, Mississippi, 1798-1876 (1909), describes "the beautiful Bogue Chitto River" in pre-Civil War days.

This stream takes its rise from a multitude of springs and branches that come out north and west of Brookhaven, in Lincoln County, Bogue Chitto and Johnson stations, and flows in a southeasterly direction through Pike County and Washington Parish and empties into Pearl River in St. Tammany Parish, La. It is one of the most lovable and picturesque streams to be found anywhere in the South. Its waters, coming from pure limpid springs that supply its numerous tributaries, flow softly and sweetly over gravel beds from the northern boundary of the county till it passes away in its meanderings into Louisiana, mirrowing in its bright waters the grand scenery bordering either side of it for over a hundred miles. At intervals, and alternately, it is overlooked by high ridges covered with majestic pine, oak, beech, magnolia and a multitude of other valuable growth, that moan eternally as they are fanned by the ocean's breezes. Its waters, like all other inland streams, were full of fish, and its forests inhabited by wild game in great abundance, and the trapper and the hunter had all the employment desired.
* * * * * *
The river for a long distance in front of Holmesville [just north of the area in dispute today] was deep and unfordable and had to be crossed on flatboats made for the purpose and used as public ferries.
Conerly, at 15.
[5] See Steamboat Magnolia v. Marshall, 39 Miss. 109, 121 (1860); Morgan v. Reading, 11 Miss. (3 S. & M.) 366, 401-402 (1844). The Steamboat Magnolia case is particularly revealing for its quotation from De Jure Maris (1667) where Lord Hale itemizes and lists among "public rivers, juris publici" not only the Thames River but also "the rivers Wey [and] Severn." Steamboat Magnolia, 39 Miss. at 121. The Severn River is approximately 180 miles long, about the same as the Bogue Chitto. The Wey River, however, is only 35 miles long, meandering through the Surrey County countryside.

The Steamboat Magnolia incorporated into the law of this state the English rules for deciding whether rivers are public or private. When it accepts that rivers such as the Wey and Severn are public, one who would exclude a 175 mile river such as the Bogue Chitto shoulders a burden Landowners bear not poorly but not at all.
[6] Director of the Bureau of Land and Water Resources, Mississippi Department of Natural Resources.
[7] This would make the Bogue Chitto in the area in question public under the 100 cubic feet per second standard of Miss. Laws ch. 598, § 1 (1988), now codified as Miss. Code Ann. § 51-1-4 (Supp. 1989). See Part IV(F), infra. The Department of Natural Resources has certified that the Bogue Chitto is public up to the confluence of Boone Creek in Lincoln County, well above the presently contested area.
[8] For example, the U.S. Geological Survey shows the average discharge for the Pearl River to be 4.084 at Jackson and 7.384 ft/s at Columbia. Water Resource Data at 105, 113.
[9] Luke Ward Conerly reports, again in pre-War days that

The beautiful river with his crystal waters flowing past its doors afforded recreation in boating, bathing and fishing.
Conerly, supra, at 115, referring to the River near Holmesville.
[10] We take comfort in the fact that others, who have considered the matter more thoughtfully than have we here, long regarded the Bogue Chitto River as in the public domain. In October of 1966 the Mississippi Research and Development Center published Outdoor Recreation Plan: Resources and Opportunities in Mississippi, citing the Bogue Chitto as among the rivers "presenting potential opportunities for water-recreation," including fishing, boating and water-skiing, and swimming. Page 3.33. In 1976 the Bureau of Outdoor Recreation, Mississippi Park Commission, updated the State-wide Comprehensive Outdoor Recreation Plan and recommended state maintenance and preservation of a series of free flowing rivers. Among these we find the entry, "Particularly cited is the Pearl River system, including `Bogue Chitto River: U.S. Highway 51, Lincoln Co. to La. Line.'" See page 90.

More recently the Department of Natural Resources has published a partial listing of streams qualifying for public waterway status, including the Bogue Chitto River from the "confluence of Boone Creek, Lincoln County, to the MS-LA state line." See note 7, supra; Part IV(F), infra.
[11] Owens, Steamboats and the Cotton Economy: River Trade in the Yazoo-Mississippi Delta 1 (publication pending, 1990). Prof. Owens carefully documents small steamboat traffic on the Yazoo and Sunflower River Systems, particularly in 1870-90. Of note is the traffic on the Sunflower, Tallahatchie, Yalobusha and Quiver Rivers and into Bogue Philia, all natural flowing streams like unto the Bogue Chitto.
[12] See Conerly, supra, at 15, 114-115.
[13] The question what waters are public is one of law and thus one ultimately for the judicial department of government. Still, it is a fact of our political history that our legislature has been a principal expositor, telling us from time to time what waters are public, see Howard and Hutchinson, Miss.Stats., ch. 38, § 55 (1840) through and including Miss. Laws, ch. 598 (1988).
[14] The Chancery Court held unconstitutional Section 51-1-4 as it existed prior to 1988.

Without doubt, our constitutional scheme contemplates the power of judicial review of legislative enactments, Alexander v. State ex rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983); however, that power may be exercised affirmatively only where the legislation under review be found
in palpable conflict with some plain provision of the... constitution.
Hart v. State, 87 Miss. 171, 176, 39 So. 523, 524 (1905). Statutes such as (now repealed) Section 51-1-3 come before us clothed with a heavy presumption of constitutional validity. See, e.g., Burrell v. Mississippi State Tax Commission, 536 So.2d 848, 858-59 (Miss. 1988); In Re Estate of Smiley, 530 So.2d 18, 21-22 (Miss. 1988); Jones By Jones v. Harris, 460 So.2d 120, 122 (Miss. 1984); Clark v. State ex rel. Mississippi State Medical Association, 381 So.2d 1046, 1048 (Miss. 1980); Genesco, Inc. v. J.C. Penney Co., Inc., 313 So.2d 20, 24 (Miss. 1975); McCaffrey's Food Market, Inc. v. Mississippi Milk Commission, 227 So.2d 459, 462 (Miss. 1969). It is our duty to sustain it if this may be done without violence to constitutional concepts. To state that there is doubt regarding the constitutionality of an act is per force to declare it constitutionally valid. Ivy v. Robertson, 220 Miss. 364, 370, 70 So.2d 862, 865 (1954); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); The Sandy Bayou Mandamus Case (State ex rel. Greaves v. Henry), 87 Miss. 125, 143, 40 So. 152, 154 (1906). See also Loden v. Mississippi Public Service Commission, 279 So.2d 636, 640 (Miss. 1973); Chassanoil v. City of Greenwood, 166 Miss. 848, 860, 148 So. 781, 783 (1933) aff'd, 291 U.S. 584, 54 S.Ct. 541, 78 L.Ed. 1004 (1934); Hart v. State, 87 Miss. 171, 176-177, 39 So. 523, 524 (1905).
[15] The Chancery Court held that the Bogue Chitto River in the area in question was not a public waterway within the meaning of the (now repealed) 1972 version of Section 51-1-4. This holding was generated by a complete misreading of that statute. Because our scope of review is implicated, the error needs explanation.

The 1972 act provided that such portion of the river having a length of not less than five miles and having an average depth along the thread of the channel of three feet for ninety consecutive days and an average width at low water of not less than thirty feet shall be a public waterway. The Court got hung up on the statute's average depth proviso and construed it to require that plaintiffs prove that the average depth of the river along the thread of the channel was exactly three feet, not an inch more and not an inch less. In the Court's words
It has been brought to the attention of the Court quite convincingly and emphatically that the language dealing with depth is "three feet," no more and no less. While the intent of the language seems obvious to the Court, it must be admitted that it fails.
The Court then rejected Plaintiffs' claim that the Bogue Chitto was public under Section 51-1-4 because
There is no evidence before this Court, that the Bogue Chitto River has an average depth along the thread of the channel of exactly three feet for ninety consecutive days ... A strict construction of the statute is not only proper, but necessary.
We think it abundantly apparent that the three foot requirement meant that to be public a waterway had to have an average depth of not less than three feet. Statutes should be read sensibly, see Sheffield v. Reece, 201 Miss. 133, 143, 28 So.2d 745, 749 (1947), and this is so even if it means correcting the statute's literal language. Gandy v. Public Service Corporation of Mississippi, 163 Miss. 187, 197, 140 So. 687, 689 (1932). The Court below acknowledged that "the intent of the language seems obvious," but then ignored the obvious. The reading the Court gave the statute would have declared private the Yazoo River, the Pearl or the Pascagoula, at points no one would dream of suggesting they were not in the public domain. All of this brings the Court's findings that the Bogue Chitto within a well recognized exception to our otherwise limited scope of review of findings of ultimate fact, to-wit: where such findings have been induced by application of an erroneous legal standard, they are entitled to no deference on appeal. See Dycus v. Sillers, 557 So.2d 486, 503 (Miss. 1990); Leatherwood v. State, 539 So.2d 1378, 1387 (Miss. 1989); cf. Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987).
Because Section 51-1-4 has since trial been substantially amended  and the "three feet" standard obliterated  nothing turns on the point in the end.
[16] This enactment has been amended so that the test for whether waters are public is now

such portions of all natural flowing streams in this state having a mean annual flow of not less than one hundred cubic feet per second, ... .
Miss. Laws, ch. 598, § 1 (1988) now codified as Miss. Code Ann. § 51-1-4 (Supp. 1989). See notes 3, 7 and 10, supra.
[17] The Chancery Court has misread this statute, although because it, too, was repealed in 1988, nothing turns on the point. Still, explanation of the Court's error is in order.

The Chancery Court states
Section 51-1-3, Mississippi Code of 1972 further provides navigable waters shall be public highways, provided they have been declared to be navigable by acts of the legislature or by the board of supervisors. Neither the legislature nor the board of supervisors of Pike County, Mississippi, have declared the Bogue Chitto River to be navigable.
Careful reading of the statute, quoted above in footnote 2, reveals this reading in error. The requirement that the legislature or the board of supervisors declare navigability applies only to "lakes, bayous and other watercourses." The statute declares "all bays, inlets and rivers" to be "public highways" without further ado. Not only is this reading of the statute linguistically correct; it makes sense. It is difficult to imagine a naturally created body of water rising to the dignity of a "bay", "inlet", or "river" that would not be public. On the other hand, having reference to the rule noted elsewhere that many small bodies of water, though natural or naturally flowing, may be private, the legislature sensibly provided in the case of "lakes, bayous and other watercourses" for a case by case investigation and determination. Because the Bogue Chitto rises to the dignity of a river, Section 51-1-3 as it read at the time of trial declared it a "public highway." That statute now having been repealed, the Bogue Chitto's status as a public waterway must rest on the 100 cubic feet per second standard of amended Section 51-1-4, subject only to possible federal law to the contrary, a point neither pressed nor apparent.
[18] This statute was repealed in 1988. See Miss. Laws, ch. 598, § 2 (1988), and replaced by what is now Section 51-1-4. See notes 2 & 12, supra.
[19] The beds of navigable freshwater rivers, lakes and streams are susceptible of private ownership. Dycus v. Sillers, 557 So.2d 486, 498 (Miss. 1990); Cinque Bambini, 491 So.2d 508, 517 (Miss. 1986); State Game & Fish Commission v. Louis Fritz Co., 187 Miss. 539, 563, 193 So. 9, 11 (1940); Morgan v. Reading, 11 Miss. (3 S. & M.) 366, 399 (1844). Mississippi's view of the private property rights of riparian landowners has become firmly established and widely recognized, Archer v. Greenville Sand & Gravel Co., 233 U.S. 60, 67-69, 34 S.Ct. 567, 569, 58 L.Ed. 850, 853 (1914); Hardin v. Jordan, 140 U.S. 371, 381, 11 S.Ct. 808, 811, 35 L.Ed. 428, 433-34 (1891), despite public ownership of the tidelands. Cinque Bambini, 491 So.2d at 517; State ex rel. Rice v. Stewart, 184 Miss. 202, 223-28, 184 So. 44, 47-49 (1938). Equally well settled, record owners of the beds and bottoms of navigable freshwaters have no right to exclude others from the waters' surface.

For example, if oil, gas or other minerals are discovered beneath the beds of the Bogue Chitto River or any other navigable stream, they would belong to the record titleholders as their interest may appear, and this notwithstanding that the waters may be regarded as navigable or otherwise public.
[20] See note 11, supra. This suggests a powerful analogy still extant in our law. One may not be landlocked or isolated on his homestead. Where a person conveys an interior lot to another, the purchaser by implication acquires a "way of necessity" from his lands to the public roads. Quin v. Sabine, 183 Miss. 375, 382-83, 183 So. 701 (1938); Board of Supervisors of Lamar County v. Elliott, 107 Miss. 841, 846, 66 So. 203, 204 (1914). Pleas v. Thomas, 75 Miss. 495, 500, 22 So. 820, 821 (1897), notes that the reasons for this rule "need not be sought afar, for they are obvious at a glance." As the owner of such property has the right to use, occupy and enjoy it, he must necessarily have a right of ingress and egress. In years gone by, rivers such as the Bogue Chitto were our only means of ingress and egress to much of Mississippi. The public waters trust at its birth was in the nature of a way by necessity.
[21] William Faulkner tells of the steamboat that came up "our [Tallahatchie] river year after year" and "how one day during the high water, ... the steamboat came and crawled up on a sandbar and died," Faulkner, "A Justice" in Collected Stories, 346 (Vintage Books Ed. 1977). Allowing for literary license, this still suggests that in days of old there was substantial commercial traffic on the inland waterways of the State of Mississippi, as far inland as northwestern Yoknapatawpha County. More to the point, Faulkner's fiction is testament to our forebears' amazement could they know of the suggestion that our inland rivers were not available to the public. See also Owens, Steamboats and the Cotton Economy: River Trade in the Yazoo-Mississippi Delta, (publication pending, 1990), for extensive documentation that much smaller than 200-bales-of-cotton steamboats regularly used the Yazoo-Mississippi Delta waterways, particularly from 1870 to 1890. That the railroads and then roads put such steamboats out of business hardly operates to withdraw the waterways from the public domain, as their capacities remain, as do the fishermen, augmented by the advent of weekend pleasure boaters and canoers.
[22] This quotation comes originally from the case of The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999, 1001 (1870), surely one of the most mis-cited cases in history. The Daniel Ball was a Commerce Clause case which necessarily had to do with the authority of the United States to regulate commerce on the Grand River in Michigan. That this definition has been cited in other contexts where the Commerce Clause was not involved has been a source of great confusion over the years.
[23] Obviously, any naturally flowing stream so small that it has a mean annual flow of less than 100 cubic feet per second has no business masquerading under the label "river," although quite obviously every river in this state at its source is of such small size, and we today pretermit the question whether such portions of otherwise public rivers are private.
[24] Miss. Const. Art. 3, § 14 (1890) reads:

No person shall be deprived of life, liberty, or property except by due process of law.
[25] Miss. Const. Art. 3, § 17 (1890) reads, in relevant part:

Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; ... .
[26] Our Constitutions of 1817, 1832 and 1869 were silent on the subject of public navigable waterways.
[27] The original version of this statute is Howard and Hutchinson, Miss.Stats. ch. 38, § 55 (1840).
[28] See note 15, supra.
[29] This premise coexists with the equally powerful legal reality that the meaning of the phrase "navigable waters" is and always has been dynamic on at least three fronts: (1) through the forces of nature, through accretion, reliction, flood or avulsion; (2) the definition of public waters has changed "as human needs have evolved and as the public welfare has demanded" and (3) the legal language has evolved, as explained above. See Dycus v. Sillers, 557 So.2d at 498-99. Culley gives us nothing explaining how or why in the days immediately succeeding the Constitution of 1890, the phrase "navigable waters" was not understood as including rivers like the Bogue Chitto in the area here in dispute.
[30] See Miss. Laws, ch. 64, § 1 (1896). This 1896 declaration has been twice codified, first in Chapter 3 on "Construction of Statutes," Miss. Code Ann. § 1-3-31 (1972), and, second, in Chapter 51 on "Water, Water Resources, Water Districts, Drainage and Flood Control," Miss. Code Ann. § 51-1-1 (1972). In the former codification the words "and public highways" have been added at the end. These words were effectively appended to Section 51-1-1 by the next succeeding section, Miss. Code Ann. § 51-1-4 (1972), until 1988 when, as noted, that statute was repealed. Though aptly labeled "rather quaint" some thirty years ago, Culley v. Pearl River Industrial Commission, 234 Miss. at 811, 108 So.2d at 398, the Section 1-3-31 declaration persists, but it has never been the exclusive statutory definition of navigable waters.
[31] The Chancery Court relied heavily on demonstrably erroneous dicta in Culley and in Downes v. Crosby Chemicals, Inc., 234 So.2d 916 (Miss. 1970), though each of those cases, in the end, turns on the fact that the parties with the burden of proving the waterway was navigable in fact failed to offer sufficient evidence to carry that burden. Culley, 234 Miss. at 812, 108 So.2d at 398; Downes, 234 So.2d at 920. The testimony of Charles T. Branch of the Department of Natural Resources, coupled with the U.S. Geological Survey data, are more than adequate to show factually that the Bogue Chitto passes muster under today's one hundred cubic feet per second standard embodied in the 1988 amendment to Section 51-1-4, all of which we have explained above.

Culley must be read against the backdrop of what everyone now well knows: that a team of wild horses could not have prevented the Barnett Reservoir coming into being, and the law be damned; hence, the clue to the Chancery Court's fundamental error in reading Culley: that the public imperative required the Pearl be held non-navigable, that it be placed in public domain. The overpowering impulse in Culley was that constitutionally permissible petty larceny of the police power trampling very real rights of private property as opposed to the ephemeral ones invoked here. Anomaly attends citing Culley to protect private property.
When you think about it, the suggestion that the Pearl River was not navigable just above Jackson in the late 1950s borders on the ludicrous. Recall that the reason the U.S. Army Corps of Engineers had authority to construct dams and reservoirs at Arkabutla, Sardis, Enid and Grenada was that the Coldwater, Tallahatchie, Yocona and Yalobusha Rivers are/were navigable. See United States v. Appalachian Power Co., 311 U.S. 377, 404-10, 61 S.Ct. 291, 297-300, 85 L.Ed. 243, 250-54 (1940).
[32] We note what distinguishes this case from Dycus v. Sillers, supra. The chute leading from the public waters of Lake Beulah into Beulah Crevasse is of contours and capacities like unto the Bogue Chitto River. The reason our law holds the chute private is that, after it had almost completely silted in, and impassable by craft of any size, the Corps of Engineers in 1929 redug it incident to a levee construction project. Its present navigable capacity has an artificial and man-made source. Similarly, the otherwise landlocked Beulah Crevasse is not public waters. The Bogue Chitto, on the other hand, is a naturally flowing stream. The public waters of this state include all naturally flowing streams, navigable in fact or with reasonable channel maintenance and dredging by public authorities. Waters lose their public character when they become (substantially) silted in as occurred with the chute leading to Beulah Crevasse. Dycus, 557 So.2d at 502-04.
[1] More disingenuously, it cites the recent decision, Dycus v. Sillers, 557 So.2d 486 (Miss. 1990), to support this taking of private property. In that case, following a fulsome seven-page dissertation on the fascination of fishing, the majority flip-flopped and forbade a few fishermen any right to go upon "Beulah Crevasse," an adjunct of the Mississippi River, which the record showed could indeed float a steamboat. In fact Beulah Crevasse is not even on any tax assessment rolls, yet the Court found that "interesting but similarly unpersuasive." Is the majority seeking penance in south Mississippi for what it did in the Delta?
[2] The record does not give a more accurate description of the river, or the distances along the river of the property owned by Pike County, and the respective landowners. With that marvelous ability to divine facts not disclosed in the record, the majority assures us factually that while floating logs down the river "may be questionable; nonetheless it could be done." (Majority Opinion, p. 1144) O'Quinn, who had lived on the river 72 years, testified it had never been used for logging. The majority, with its unlimited expertise, qualifies itself as an expert on river logging.
[3] Art. 3, § 14 of the Mississippi Constitution states:

Section 14. No person shall be deprived of life, liberty, or property except by due process of law.
Art. 3, § 17 states:
Section 17. Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public. [Emphasis added].
Also, see Amendments V and XIV to the U.S. Constitution.
[4] This does not mean that the riparian owner on a non-navigable stream can wholly use up or divert the waters themselves. The utilization of surface waters is the subject of another body of case law and statutes. See, Palmer v. Massengill, 214 Miss. 379, 58 So.2d 918 (1952).
[5] The majority holds that before landowners can claim that they have been deprived of property without due process of law, they must first show that they hold property rights in the river. (Majority Opinion, p. 1167) This amounts to placing the burden of proving non-navigability on the landowners which is contrary to Culley, supra, and Downes, supra. See also 65 C.J.S. Navigable Waters § 9 (1966).
[6] Section 81 of the Constitution, prior to its amendment in 1968, read as follows:

Section 81. The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of draw-bridges for railroads, or other roads, nor the construction of booms "and chutes" for logs in such manner as not to prevent the safe passage of vessels, or logs, under regulations to be provided by law. [Emphasis added]
[7] It is true that there was also in effect at the time of the passage of this statute § 3898 of the 1892 Code, later Miss.Code. Ann. § 51-1-3:

All bays, inlets, and rivers, and such of the lakes, bayous, and other watercourses as shall have been, or may be, declared to be navigable by act of the legislature or by the board of supervisors of the county in which the same may be, shall be public highways.
There is nothing to suggest that this statute intended to carry with it any authority of the legislature or board of supervisors to declare a stream, lake or bayou which was clearly non-navigable in fact navigable as a matter of law. If such had been the legislative intent, there would have been no necessity for enactment of Ch. 361, Laws 1972, codified as Miss.Code. Ann. § 51-1-4 (Code of 1972, 1972 Supp.), the statute in effect when this case was heard. The legislature or the Pike County board of supervisors could simply have declared Bogue Chitto River navigable, and that would have been that. As succinctly stated in 65 C.J.S. Navigable Waters, § 5(1) (1965): "A stream or other body of water is navigable in law when it is navigable in fact, and conversely, if it is not navigable in fact, it is not navigable in law."
Significantly, Miss.Code. Ann. § 51-1-3 was repealed by Ch. 598, Laws 1988, but Miss.Code. Ann. §§ 51-1-1 and 1-3-31 remain in force.
A more rational interpretation of § 51-1-3 is that it was intended to authorize the legislature or even a board of supervisors to declare a body of water navigable in fact navigable as a matter of law without necessity of a court proceeding to prove it. Culley v. Pearl River Industrial Commission, 234 Miss. 788, 811-812, 108 So.2d 390, 398, infra. The statute may very well have authorized the broadening somewhat of navigability as defined in § 51-1-1, but not to authorize a board of supervisors by a simple resolution to make navigable what in fact was non-navigable. Such a construction would have played havoc on private property titles.
If the statute ever had any utility, it had long since atrophied before its repeal in 1988. I find no record instance in its 100-year history of its use by either the legislature or a county board of supervisors.
[8] Huffman, Avoiding the Takings Clause Through the Myth of Public Rights, 3 J.Land Use & Envtl.L. 171 (1987), tells us that:

In the area of water and water-related resources, the means of constitutional circumvention already exist in the form of doctrines of public trust and reserved rights. The trick is a simple one. Rather than admitting that public action has affected a private property right and then seeking to justify that effect as a legitimate exercise of the police power, these doctrines lead to the conclusion that a private property right never existed in the first place and thus nothing has been taken as a result of the government action.
* * * * * *
... [I]t has become a means for the states to regulate and take private property without having to give even passing consideration to the fifth amendment. The takings clause is circumvented by relying on the fiction that newly created public rights existed prior to the vesting of any private rights. The law, as recorded in the case reporters, statute books, and title records, reveals that many of these assertions of long-standing public rights are pure mythology.
Id. at 173, 211.
Indeed, in footnote 17, page 175, the author quotes Humpty-Dumpty from Carroll, Through the Looking Glass, ch. 6 (1865): "When I use a word ... it means just what I choose it to mean  nothing more nor less."
Semantics should not be used by this Court to divest citizens of any property right.
[1] G. Orwell, Animal Farm (1945). On the Animal Farm were only animals. The pigs dominated the others. Every time it appeared that the law would prevent some action they desired to take, it was discovered that some language had been overlooked and that the action of the pigs was not unlawful after all.
[2] In response to footnote 22 of the majority, Thomas J. Schoenbaum in his treatise states: "[T]he term `navigable waters' has constitutional and property law aspects... . As a property law concept, navigable waters is used as the legal test of state or public ownership of submerged lands." T. Schoenbaum, Admiralty and Maritime Law § 3-3 (student ed. 1987).
[3] People v. Sweetser, 72 Cal. App.3d 278, 140 Cal. Rptr. 82 (1977); Ritter v. Standal, 98 Idaho 446, 566 P.2d 769 (1977); Mentor Harbor Yachting Club v. Mentor Lagoons, Inc., 170 Ohio St. 193, 163 N.E.2d 373 (1959); Village of Menomonee Falls v. Wisconsin Dept. of Natural Resources, 140 Wis.2d 579, 412 N.W.2d 505 (1987).
[1] This waiver principle will not be applied inflexibly to all cases regardless of circumstances. Whether a party's action or inaction constitutes a waiver of the right to request recusal  is an issue which must be resolved on an ad hoc basis. That is, the totality of circumstances attendant each case must be perused and determinations must be made. For example: (1) Did the party know, but fail to timely reveal, purported facts which might lead to a judge's recusal? (2) Assuming the party did not actually know the facts, should the party have known? (3) Does good cause exist for the party's failure to timely reveal the facts, or (4) Are the facts indicative of some other reason  an unacceptable reason  for the untimely revelation (e.g., untimely revelation due to employment of dilatory tactics)? Finally, criminal cases may require closer scrutiny than civil cases. See, e.g., Moore v. State, 573 So.2d 688, 688-89 (Miss. 1990) (rare occasion when recusal issue never actually raised but, in view of the totality of circumstances, merits of issue addressed under "plain-error doctrine").
[2] Were this Court to address the merits of the appellees' contention, Turner v. State, 573 So.2d 657, 675-79 (Miss. 1990), would be dispositive.
[1] I fully agree with the Supreme Court of Tennessee that unwarranted challenges on a judge's interest or bias are reprehensible.

Every lawyer, worthy of respect, realizes that public confidence in our courts is the cornerstone of our governmental structure, and will refrain from unjustified attack on the character of the judges. Kentucky State Bar Ass'n v. Lewis, 282 S.W.2d 321, 326. And, it is the duty of the lawyer to maintain towards the Court a respectful attitude, not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the Bar against unjust criticism and clamor. Canons of Professional Ethics, American Bar Association, p. 116.
461 S.W.2d at 955.